JAMES W. BROWN, guardian, plaintiff in error, vs. CATHERINE WESTBROOK, defendant in error.

[1.] Mental incapacity, at the time of marriage, a ground for divorce in this State.

[2.] A libel to dissolve the marriage union, on that account, is to be filed and tried, and is subject to all the incidents regulating divorces, by the statutes of force on that subject.

[3.] A proceeding to declare marriage a nullity, on account of the mental incapacity of one of the parties to consent to the contract, at the time it was entered into, is unknown to our judiciary system, and is repugnant to the feelings and policy of our people.

Divorce, in Houston Superior Court. Tried before Judge LAMAR, at October Term, 1858.

This was a libel for divorce, at the suit of John W. Brown, as the guardian of Richard N. Westbrook, a lunatic, against Catherine Westbrook, the wife of said Richard N.

The alleged ground of divorce was the lunacy and insan-

Brown, guardian, vs. Westbrook.

ity of Richard N. Westbrook, at the time of his marriage with said Catherine, in the year 1848.

The libel further stated that, under proceedings had in the Court of Ordinary for said county, the said Richard N. was, on the 21st day of May, 1849, duly found and declared a lunatic, and the said John W. Brown appointed his guardian.

The respondent, Catherine Westbrook, the wife of the said lunatic, answered, that said Richard N. was of sound mind, and capable of contracting marriage, at the time of her intermarriage with him; that upon the facts, as stated in plaintiff's petition, a divorce should not be granted; and that he has filed no schedule of the property owned by the parties, at the time of filing the libel, as required by statute. The respondent further answered and pleaded, that the plaintiff, as guardian, was not entitled, in law, to institute proceedings for a divorce.

A special jury, at a former Term, had found a verdict in favor of a total divorce.

Upon the trial before the second jury, the plaintiff having closed his testimony, counsel for the defendant objected, that no schedule of the property of the said Richard N. Westbrook had been filed, as required by law. The Court sustained the objection, and ordered a schedule to be filed. To which counsel for plaintiff excepted.

The property owned by said lunatic, in the hands of his guardian, as per said schedule, amounted in value, over and above his debts, to $39,642 50.

The evidence on both sides being closed, the presiding Judge charged the jury, "that although they might find for the plaintiff, and grant a total divorce, on account of Richard N. Westbrook having been of unsound mind at the time of the marriage, yet they had the power to dispose of the property in such a way as to give to defendant a part thereof, if they saw proper so to do; that they were not bound to give a part to her, but it was discretionary with them to do so."

The presiding Judge further charged, that the child of de-

fendant by said Richard N., was entitled to participate in his property equally with his children by a former marriage, and that they must frame their verdict accordingly. To which charges counsel for plaintiff excepted.

The jury rendered the following verdict, viz:

"We the jury find that sufficient proofs have been adduced to our consideration to authorize a total divorce; that is to say, a divorce *a vinculo matrimonii* between the parties, Richard N. Westbrook, and Catherine Westbrook, his wife, upon legal principles. And we also find and decree that property to the amount of TEN THOUSAND DOLLARS be left in the hands of the guardian of the said Richard N. Westbrook, for his support, and at his death to go to and be equally divided between the children of the said Richard N. Westbrook, by his first wife, and the child of the said Richard N. and Catherine, by the last marriage, (the marriage hereby declared void,) share and share alike. And we further find and decree that property of the estate of the said Richard N. Westbrook be turned over by his guardian, to a trustee to be appointed for that purpose, to the amount or value of FOUR THOUSAND DOLLARS, the annual proceeds or interest of which only is to be applied to the support and maintenance of the said Catherine during her life; and at her death, said four thousand dollars to be equally divided between the children of the said Richard N., by his first wife, and the child by the said Catherine, his last wife. The rest of the property of the said Richard N. Westbrook, now in the hands of the said guardian, be divided between the children of the said Richard N., by his first wife, and the child by his last wife, Catherine, as above specified, share and share alike; provided all just debts of the said Richard N. Westbrook are first paid."

Plaintiff objected to that part of the verdict disposing of the property of Richard N. Westbrook, and especially to that part allowing the said Catherine, and her child by the said Richard N., any part of said property. The objections were overruled by the Court, and the verdict ordered to be recorded.

Afterwards plaintiff's counsel moved to set aside that part of the verdict above objected to.    The Court refused the motion, and plaintiff excepted.

SAM. HALL; JNO. M. GILES, for plaintiff in error.

SAM. D. KILLEN, *contra.*

*By the Court.*—LUMPKIN J. delivering the opinion.

This was a libel for divorce, brought by Brown, as guardian of Westbrook, against Catherine, his wife, on the ground of *mental incapacity* at the time of the marriage. The plaintiff failing to file a schedule, the Court, on motion, compelled him to do so.    And the special jury found, that sufficient proofs had been submitted to them to grant a total divorce between the parties.    They further found, that $10,000 be set apart for the support of the lunatic during his lifetime, $4,000 for the maintenance of the wife, and the residue of the property, including the remainder of these two funds, be equally divided amongst the children of the lunatic by a former wife, and the child of the present marriage.

It is insisted by the plaintiff below, and the plaintiff in this Court, that so much of the verdict shall stand as separates the parties; and he proposes to arrest and vacate that part of it which makes provision for the wife and the offspring of the second marriage.    The position assumed is, that this marriage was not voidable only, but void for want of capacity in the husband to consent to the contract.    And that consequently, the marriage being meretricious, the parties have been living together in a state of concubinage, and not of wedlock, and that the offspring of this unlawful connexion is a bastard.

This is a grave question ; one of much magnitude, not only to the parties immediately concerned, but to society. Whether such a marriage be void, or voidable only, before a commission of lunacy issue, and office found, I shall not stop

to inquire.   The old authorities, and perhaps the weight of authority, previous to the Act of George II., are in favor of the latter proposition.   But with my view of this case, it is unnecessary to worry myself or others, as to what was or was not the transatlantic law, ancient or modern, or the law of any other State, upon this subject.

[1.] Nowhere else is mental incapacity, except in Georgia, so far as I know, made a ground for *divorce*.   Elsewhere, proceedings are instituted in chancery, or some other Court, to annul the pretended marriage.   A sentence of *nullity* is rendered.   Now, I maintain broadly, that in this State no decree can be rendered, separating man and wife, where there has been a marriage *de facto*, except under our Divorce Laws. That they have virtually repealed the whole body of the English Ecclesiastical and Common Law, upon this subject. Was any such proceeding ever known or heard of in Georgia, to obtain a sentence of *nullity ?*   The recollection of the bar, and the records of the Courts, furnish no such precedent. On the contrary, separations between those who are husband and wife *de facto*, have only been effected by the Act of the Legislature, or of the Courts, or by the joint action of both ; and that, too, in a proceeding both in form and substance, *for a Divorce.*

It may be said that the power may exist, although it has lain dormant since the beginning of our history, liable to be called at any time into action.   The failure to exercise this power, is strong evidence that it never was recognized and adopted by our people; and our statutes show that it is distasteful to their feelings and sense of right.   I should be reluctant myself to give vitality to any great principle of the law, which had slept for three-quarters of a century.

The whole tenor of our legislation favors the view which I have taken of this subject; and it is right that it should. No innocent woman should be separated from the man whom she supposed to be her husband, without being provided for ; and the idea of bastardizing the children of such a marriage,

is monstrous. And that is just what the plaintiff in error is seeking to have done in this case. If the woman has been guilty of a fraud and circumvention, turn her away penniless, if you please, as a punishment for her misconduct. The divorce jury have the power to do this. But the guiltless progeny—never! The special jury have exercised their power in this case, as they generally do, wisely and well. The commission of lunacy never issued until after the marriage; and no trick or artifice is attributed to the wife, in procuring this marriage. It is said the husband was rich and she was poor, and that misalliances of this sort rarely occur under any other circumstances. Do mercenary matches never take place, in this our day and generation, except amongst the insane? Such a conclusion, I regret to say, would almost stultify our race. Love matches! They exist only in the creation of novelists. They are rarely known in actual life.

[2.] But suppose I am wrong in all this. Here, the plaintiff, instead of instituting a proceeding to declare the marriage a nullity, has seen fit to sue out an old fashioned libel for divorce. The jury were sworn, proofs offered, and a verdict rendered under our divorce laws. And the proposition is, to hold on to his half of it, and repudiate the residue! This will not do. It may be that there are cases where a verdict and judgment might be separated; where one part is not the consideration for the other. But the jury, in this case, might never have agreed to dissolve this union, without making adequate provision for the wife and child. And to let one part stand, and not the other, might be to defeat the finding of the jury. I doubt not it would. But for the verdict, as a whole, it never would have been rendered. We have not the evidence in the record. And it might be inferred, that it was restricted to the issue made in the pleadings. But it is stated by counsel, that the certificate of the Superintendent of the Asylum was read, giving it as his opinion that the insanity of Westbrook was permanent and

incurable. How natural was it for the jury to overlook the real issue, to-wit: his mental capacity at the time of the marriage, and conclude that inasmuch as the parties were divorced in fact, and that for life, that it was best for all concerned to declare them so in law; and fix the status of the parties, as well as the division of the property, so that it might be managed with safety by the guardian, and beneficially for the lunatic and his family. And this I maintain they had a right to do.

I care not to what forum the lunatic, by his guardian, appeals; nor what form of proceeding he adopts; a jury in Georgia will never be found who will pronounce a woman, whose conduct is unimpeached, a fornicatress, and her babe a bastard. And yet this result is inevitable under a sentence of nullity. Neither will they drive her and her child, like Hagar and Ishmael, with only a morsel of bread and a bottle of water, to starve in the wilderness, while the husband and the father have a plenty and to spare. Should any such be thus unfeelingly expelled from the hearth and homestead, which they supposed to be their own, may they receive that comfort and support from Heaven, which were vouchsafed to the Egyptian handmaid of old, although denied to them by man!

What shall we do then? Declare this whole proceeding a nullity? We are not asked to do this; but to reverse the judgment of the Court below for refusing to vacate a part of it. For myself, I believe the proceeding legal and the verdict just and binding; and vote for affirming it *in toto*. I should not represent the genius and gallantry of the men of Georgia, standing out so prominently in all our laws, were I to do otherwise.

This Court had, by one of its decisions, limited divorces to the legal grounds existing at common law. The Legislature, in 1850, passed an Act specifying the causes upon which divorces from the bonds of matrimony should be granted. And the second ground enumerated is, *mental in-*

*capacity at the time of marriage. Cobb,* 226. It is mani-
fest, therefore, that the General Assembly supposed that men-
tal incapacity at the time of marriage, was a ground for *di-
vorce,* and not for a sentence of *nullity.* So have thought the
bar and bench since the organization of our State judiciary.
So thought the counsel in the case; else why file this libel
in the Superior Court?

It is said that a sentence of nullity does not bastardize the
issue. That is, the sentence does not say so, *in form.* But
this is sticking in the bark. When that is the necessary and
inevitable effect, it is not pretended but that it will follow, as
a matter of course, in this case.

It is said that North Carolina, and some of the other States
perhaps, have divorce laws, and yet entertain proceedings to
annul marriages. Their divorce laws, as well as the spirit of
their people and institutions, are different from ours. Their
policy may be different. Our Legislature has done its ut-
most to save innocent children from the brand of illegitima-
cy. By the 7th section of the Act of 1806, *(Cobb,* 225,*)* it is
provided that in *all cases* of divorce, the issue of the marriage
shall not be bastardized; but shall be capable of taking by
descent or distribution from either of their parents. And
with this sweeping declaration they felt content; believing
as they did, that the marriage relation could not be annulled,
except by divorce. But to demonstrate still further their set-
tled and determined policy, upon this subject, it is enacted,
*(Cobb,* 814,*)* that even in cases of bigamy, the offspring
shall not be spurious, if born before prosecution, or within
the ordinary period of gestation afterwards. Where there is
a husband or wife living when the second marriage is formed,
the suffering party does not always seek a divorce. Hence
the propriety of this provision. If they did, the children
would be protected under the 7th section of the Act of 1806.

It may be said that this clause in the code shows, that
without it the offspring would have been bastards. Hence it
may be argued, that in case of mental incapacity to marry,

the same consequences must follow. Not so, according to my doctrine. Marriage can only be dissolved, for this cause, by divorce; and then the statute intervenes to save the offspring. Without sentence of nullity or divorce, who would run the risk of forming a second marriage, on account of want of capacity to contract the first? A fact to be decided upon the evidence of witnesses and the opinion, a jury might entertain of the testimony. Bonds thus entered into should be binding until formally and legally dissolved. Such is and ever has been the understanding of the country, and of all departments of the government.

Judgment affirmed.

McDonald J. concurred.

Benning, J. dissenting.

The question is, was the Court below right in holding, that the jury might make provision for the defendant and her child out of the property of the plaintiff, Westbrook?

Such provision the law admits of, only in divorce cases. Therefore, if this was not a divorce case, the Court must have been wrong.

Was this a divorce case? A divorce case is a case in which, the plaintiff states a marriage between himself, or herself, and the defendant, and prays that for some alleged cause, he or she may be divorced from the defendant. The declaration must state a marriage, for where there is no marriage, there can be no divorce. Divorce is the partial or total separation—*unmarrying*—of married persons, and there can be no separation, if there has been no union—no unmarrying, if there has been no marrying. The declaration, then, must state a marriage: if it states that there was no marriage, it is impossible, that the case can be a divorce case.

Does the declaration in this case fail to state a marriage—

does it rather state what shows, that there was no marriage ?
It does.   It states, that at the time when, what it assumes as
a marriage, was entered into, one of the parties, the plaintiff
in this case was a lunatic.   And a lunatic is incapable of
entering into marriage, for marriage is a contract, and a lu-
natic is incapable of entering into a contract.   Suppose
the declaration had stated, that, at the time of the assumed
marriage, one of the parties was an infant not over five years
old ; or was a slave ; or was a person with a living husband
or wife ; would it not have stated what would show, that
there was no marriage ?   Most certainly it would,  and why,
because an infant five years old; a slave; a  person  with a
living wife or husband ;  is incompetent  to enter into mar-
riage.   A lunatic is just as incompetent.   It is true, then,
that the declaration states what shows it to have been im-
possible, that there could have been a marriage.   The case,
then, made by the declaration, is, in law, precisely what it
would have been, had the statement in the declaration been,
that there had never been any marriage at all, between the
parties.   And such a case as that, I think I may assume, is
not a divorce case.

Did ever any person hear of a divorce case between a free
person and a slave—or between parties one or both of whom
was a bigamist?   And why not ?   Because, marriage cannot
exist between such persons.   It is equally true, that mar-
riage cannot exist between persons, one of whom, is an idiot
or a lunatic.

It is true, that the divorce Act of 1850, has,—"mental in-
capacity at the time of  marriage"—as one of its grounds of
divorce; but is that equivalent to  saying that idiots, luna-
tics, and infants five years old, are competent to enter into
marriage?   By no means.   Suppose an Act to say, that one
ground of avoiding contracts should be mental incapacity at
the time of the contract—would any body maintain, that the
Act impliedly said, that slaves, idiots, lunatics and children un-
der seven,  were competent  to make contracts?   Nobody, I

think, could seriously maintain, that the doctrine of legislation by implication, should be carried these lengths—the truth is, that expressions of this sort, are the result of mere inadvertence. If there is "mental incapacity" to enter into marriage, marriage is never entered into; and if marriage is never entered into, to talk of divorce, is to talk of death, when there has never been any life. This any one sees when his attention is called to it.

These things being so, this case in my opinion is not a divorce case;—and, consequently, is not a case to admit of the decision of the Court below.

True, such an opinion as this of mine, might "bastardize the issue," as the expression is, and leave it and the mother, without provision, from the father. But what is the evil of these things, as compared with the evil of holding, that all persons laboring under "mental incapacity" to marry, may yet marry and (by consequence) make any other contract— that idiots, lunatics, infants old enough to say yes, slaves even, may marry or make any other contract. In truth, though there may, in these cases, be cause for sympathy with the issue, there can hardly ever be any cause for sympathy with the parent. The fact will be, that in nine of the cases out of every ten, the parent was a fortune hunter, and acted with open eyes. Marriage will never invade the idiot or the lunatic, who is without fortune.

But, if this is not a case for a divorce, what is it a case for? I answer, it is a case for a sentence of *nullity* of marriage. Such cases are of frequent occurrence in the English Ecclesiastical Courts. There is never any absolute necessity for such a sentence, yet such a sentence is in many cases, valuable, and is more desirable on several accounts. The Divorce Acts do not provide for a suit, to attain such a sentence.

Does it thence follow, that no way exists by which such a sentence may be attained? I am not prepared to say so. The Act of 1820, giving equity jurisdiction, says, that "the

Superior Courts" "*shall* exercise the powers of a Court of Equity, in all cases where a common law remedy is not adequate." The cases under consideration, are cases in which, there is no remedy at all at common law, why then are they not cases provided for, by this Act ? I do not see why.

For these reasons I dissent from the judgment of the Court.