## JANNETT C. PYOTT

*v.*

## JAMES M. PYOTT *et al.*

*Opinion filed June 19, 1901—Petition stricken from files October 4, 1901.*

1. PARTIES—*guardian of insane defendant may maintain cross-bill to annul marriage.* If the defendant to a bill for separate maintenance is insane, the guardian *ad litem* may maintain a cross-bill to annul the marriage upon the ground that it was void *ab initio*, for want of mental capacity on the part of his ward to enter into marriage.

2. JURISDICTION—*when court has jurisdiction to determine issue as to insanity of defendant.* If it is represented to the court that the defendant to a separate maintenance suit is insane, a gardian *ad litem* may be appointed, and if the insanity of the defendant at the time of the marriage is put in issue the court has jurisdiction to determine such issue without a jury.

3. CROSS-BILL—*when court may entertain cross-bill to annul marriage.* It is competent for the court, in a separate maintenance proceeding, to entertain a cross-bill to annul the marriage.

4. MARRIAGE—*when marriage is void ab initio.* A marriage is void *ab initio* where the mental faculties of the husband were so impaired that he was unable to understand the nature and effect of the act of marriage, and where he was subjected to improper influences exerted to the end that the conspirators might profit thereby.

*Pyott* v. *Pyott*, 90 Ill. App. 210, affirmed.

APPEAL from the Branch Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. MURRAY F. TULEY, Judge, presiding.

JAMES SMITH, for appellant.

R. M. WING, and JESSE COX, for appellees.

Mr. JUSTICE BOGGS delivered the opinion of the court:

The appellant, on the 8th day of December, 1898, filed a bill in chancery in the circuit court of Cook county, in which she alleged that an agreement to enter into marriage was made by and between herself and one James M. Pyott, Sr., on the 14th day of October, 1898, and that

on the 20th day of October, 1898, they were lawfully married in the city of Chicago, and that they lived and cohabited together as husband and wife until the 21st day of November, 1898, and that on said last mentioned day said James M. Pyott, Sr., of his own wrong and without fault on her part, deserted and abandoned her, and she prayed for a decree under the provisions of the act in relation to married women, approved May 17, 1877, requiring the defendant, said James M. Pyott, Sr., to pay an amount, to be fixed by the court, for her reasonable support and maintenance while they should so live separate and apart.

It being represented to the court that said James M. Pyott, Sr., was insane, one James M. Pyott, Jr., his son, was appointed by the court as guardian *ad litem* and next friend of said James M. Pyott, Sr., and authorized to defend for the said James M. Pyott, Sr., and was also given leave to file a cross-bill in the cause for and in behalf of the said James M. Pyott, Sr.  An answer and cross-bill were accordingly filed.  The answer alleged, in substance, that at the time of the alleged promise to marry appellant, on the 14th day of October, 1898, and for a long time prior thereto, and also at the time said supposed marriage ceremony was performed, and for a long time prior thereto, James M. Pyott, Sr., was, and has ever since continued to be, not of sound mind and memory, but that, on the contrary, he was at said time seventy-two years of age and in his dotage, and his mind and memory were so impaired as to render him wholly incapable of entering into the contract of marriage, and that he was then, and is now, insane; that the said James M. Pyott, Sr., was the owner of property of the value of $100,000; that he was a widower, his wife, with whom he had lived for more than forty years, having died about a year before the alleged marriage with the appellant; that appellant was a woman of bad moral character, lewd and unchaste and the mother of a bastard child, and had confederated

and combined with one Whiteford and one McMillan (all of whom were well aware of the irresponsible mental condition of said James M. Pyott, Sr.,) to entrap him into a marriage with appellant, out of mercenary motives; that said James M. Pyott, Sr., in his weak and enfeebled condition of mind, was induced by the fraudulent misrepresentations and practices of said appellant and her said confederates to submit to a clandestine marriage with the appellant; that he had not sufficient mental capacity to understand the nature and obligation of a marriage contract, and that such mental incapacity has from thenceforth continued and now exists, and that said alleged marriage with the appellant was a nullity. The cross-bill contained, in substance, the same allegations as were contained in the answer, and prayed that the alleged marriage contract and ceremony between said appellant and said James M. Pyott, Sr., should be annulled and declared by decree of the court to be null and void. Answer was filed to the cross-bill, and replication thereto, and replication was filed to the answer to the original bill.

The respective parties produced their testimony in open court and the issues were submitted to the chancellor. The court found "that at the time of the performance of said purported marriage ceremony the said James M. Pyott, Sr., was of the age of seventy-three years, and that at the time of said purported marriage ceremony, and for a long time prior thereto, the said James M. Pyott, Sr., was, and has ever since said time continued to be, insane and not of sound mind and memory; that the said James M. Pyott, Sr., was then in his dotage, and the mind and memory of said James M. Pyott, Sr., was so impaired as to render the said James M. Pyott, Sr., wholly incapable of entering into the marriage contract, and that said facts were at and before the time of said purported marriage ceremony known to the said complainant and cross-defendant, Jannett C. Patton, and to

one James C. Whiteford, in said cross-bill of complainant and hereinafter named, and that said purported marriage and marriage contract was and is therefore null and void and of no effect from the beginning,"—and entered a decree dismissing the original bill and granting the prayer of the cross-bill. The decree was affirmed by the Branch Appellate Court for the First District, on appeal. This is a further appeal to bring the proceeding into review in this court.

James M. Pyott, Sr., had reached the age of seventy-two years when the marriage ceremony was celebrated between him and the appellant. He was the father of five children, all of whom were then living and of mature age. He married the mother of these children in 1852 and lived happily with her until her death, which occurred October 27, 1897. For many years he was engaged in the foundry business in the city of Chicago, and had by the exercise of industry, energy and good business judgment acquired real and personal property of the value of perhaps $200,000. The evidence preserved in the record abundantly established that as early as 1894 or 1895, though he retained his physical strength, there was a perceptible weakening or breaking down in his mental powers. About this time he began to neglect his business, and finally lost all interest therein and all desire to attempt to manage it. His mental infirmities grew more marked, until at the time of the death of his wife, in 1897, it was apparent to his family that he was afflicted with senile dementia,—a form of insanity in the aged. After the death of his wife the unsoundness of his mental faculties developed more rapidly. The advisability of instituting proceedings in court to have him declared mentally incompetent and to have a conservator appointed for him was seriously entertained by his children, but such course was not taken for the reason it was unpleasant to make the infirmity of their father thus a matter of public notoriety. His condition during the pe-

riod which intervened between the death of his wife and the alleged marriage with the appellant was the cause of much solicitude and humiliation to his children and immediate friends. The record contains many instances in his life and conduct during this period,—and, for that matter, to the very time of the hearing,—inconsistent with the view they proceeded from a sound mind, and attributable only to an impaired and enfeebled intellect. The incidents are so numerous we cannot undertake to reproduce them within the proper limits of an opinion. Brief reference to the following instances may be made: He was an active, capable business man, but became indifferent to his business affairs and declined to talk about them, and let others manage them as they chose. During former years he was a good conversationalist, but his conversation became rambling and nonsensical, and repetitions of what he had just said. He was a member of the church of long standing and a regular attendant at religious services, pronounced thanks at meals, advocated religious and moral principles and conduct, read only religious, scientific and useful books and periodicals or standard literature, abstained from vulgar or profane language, and was modest and delicate in deportment and dress. Among the changes in his life noticeable before the death of his wife were the refusal on his part to attend church services or to render thanks at his table; that he abandoned the books he had formerly enjoyed and began reading French novels containing stories that were suggestively immoral; he told indecent stories; indulged in profane and vulgar language, with little regard to the presence of women; neglected his clothing until he appeared dirty and indecent, and at one time appeared before visitors in his bare feet. He lived happily with his wife for many years and always displayed the greatest affection for her and the strongest desire to supply all her wants, until the decay of his mental powers set in. Then it was discovered that it

was unsafe to leave him in charge of his sick wife, for
the reason he would not administer the medicines as di-
rected, or could not be made to understand the impor-
tance of observing the directions as to what should be
given her. While she was lying at the point of death he
left her presence to make social calls, despite the plead-
ings of his children that he remain at her bedside; and
while her corpse was still in their home he insisted that
a relative should play a Scottish dance tune and jig music
on a violin, and requested that a mourning dress of the
kind that was being made for his daughter should be
prepared for him. His mania soon developed a morbid
propensity to matrimony. About three weeks before the
ceremonies of marriage were pronounced between him
and appellant he began to pay courtship to a servant
girl in his family, and grew more and more demonstra-
tive, and began to follow her from room to room in the
family home, begging and imploring her to marry him.
She knew of his mental infirmity and derangement and
went to the home of his married daughter and told her
of his conduct. When the servant and the daughter of
Mr. Pyott, Sr., returned to his home they found him in the
bed-room occupied by the servant girl. He was stand-
ing in the room entirely without clothing except a short
undershirt. He greeted them with laughter and loud
cries, and they became frightened and left him. He was
afterwards found in the bed in the servant girl's room
and was induced by his son-in-law to go into the library,
where he indulged in dancing for a time. He persisted
in forcing his attentions upon this servant girl until she
became afraid of him and left the service of the family.
He insisted that one or the other of his unmarried sons
should take a wife, and when they refused he determined
to procure some woman to serve as a house-keeper. He
asked said Whiteford to recommend some one to him
as a house-keeper, and Whiteford told him he knew of a
widow living at Sedley, Indiana, who thought of coming

to the city to take a position of that kind in some family, and at his request Whiteford agreed to write to such widow. The communication between Whiteford and the widow he referred to, who proved to be the appellant and a niece of said Whiteford, resulted in an arrangement that Mr. Pyott, Sr., and Whiteford should go to Sedley on the 14th day of October, in order that he might see if he could engage the widow referred to, to serve him as house-keeper. They arrived at Sedley about the hour of eleven o'clock in the forenoon of the 14th, and went at once to the house of the appellant and remained there until about the hour of four o'clock in the afternoon of that day, when they returned to the city. The appellant testified that during the time they were at her house on that day said James M. Pyott, Sr., proposed marriage to her and that she accepted the proposal, and that it was agreed between them that she should come to Chicago on the 19th day of October,—five days thereafter. The only reference we find in his testimony to this alleged marriage engagement is this statement: "I knew when I was in Sedley that I was going to be married." Whiteford testified that while they were at lunch he was so "thunderstruck" by a remark of Mr. Pyott's to the appellant, his niece, which he (the witness) interpreted to be an offer of marriage, that he left the room; that when he returned to the room he heard a conversation between them amounting to a marriage engagement, and an agreement that his niece, the appellant, should come to Chicago on the 19th day of October, and that he and Mr. Pyott, Sr., should meet her at the depot. Appellant came to Chicago on the 19th, and on the next day, October 20, the marriage was celebrated at the house of one McMillan, in the city of Chicago. The appellant and Mr. Pyott, Sr., on the same day went to her home in Sedley. The children of Mr. Pyott, Sr., knew nothing of the matrimonial venture of their father until the notice of the marriage appeared in the public papers. The original

bill filed by the appellant charges that Mr. Pyott, Sr., abandoned her about the 21st day of November, 1898,— about four weeks after the alleged marriage. Mr. Pyott, Sr., was brought into court during the progress of the trial and was heard to testify by the chancellor.

It appeared the appellant was a niece of said Whiteford; that she was the mother of an illegitimate child,— a son,—then living, and that her character for chastity was not good when she resided in Chicago prior to going to Sedley. Other facts appearing in the evidence tended strongly to the conclusion the appellant led an unchaste life while she lived in Chicago, and also after the death of her husband, which occurred in Sedley some seven months, only, prior to her alleged marriage with Mr. Pyott, Sr. Whiteford knew that she had given birth to an illegitimate child, even if he knew no more as to her immoral conduct. He did not make this known to Mr. Pyott, Sr., but, on the contrary, falsely represented to him that she was a proper person for him to take for his wife, schemed to bring about the marriage and participated in concealing from the sons and daughter of Mr. Pyott, Sr., all knowledge that a marriage with appellant was contemplated, and intentionally aided in depriving Mr. Pyott, Sr., of the advice of his family as to the propriety of a marriage with the appellant. Whiteford had known Mr. Pyott, Sr., for some years somewhat intimately, knew he was possessed of considerable property and could not have been ignorant of the fact he was mentally unsound, and we think, with the chancellor, it was well established by the proof that the influence exerted by him over Mr. Pyott, Sr., which the latter in his weak and enfeebled mental condition was unable to resist, largely controlled the actions of Mr. Pyott, Sr., in the alleged matrimonial connections with the appellant, and that such influence was improperly exerted and exercised, and was attended with such circumstances of deception and evil intent as to amount to fraud.

We entertain no doubt, all of the evidence being considered, that the mental faculties of Mr. Pyott, Sr., had become so impaired and enfeebled that he was unable to understand the nature and effect of the act of marriage and to act rationally regarding the union with the appellant. Nor have we any doubt but that the insane impulses with which he was affected were subjected to improper influences exerted for the fraudulent purpose of inducing the celebration of the marriage, to the end that the conspirators might profit financially thereby. The evidence therefore warranted the finding that the marriage celebrated between the appellant and Mr. Pyott, Sr., was a nullity. 1 Bishop on Marriage and Divorce, 600; *Orchardson* v. *Cofield*, 171 Ill. 14; 14 Am. & Eng. Ency. of Law, (1st ed.) 489.

The doctrine that the right to sue for an absolute divorce is a personal right and requires the intelligent action of the injured party, and that for that reason the guardian or conservator of an insane person cannot maintain a suit for divorce for his ward, to which reference is made in *Iago* v. *Iago*, 168 Ill. 339, has no application to the decree rendered upon the cross-bill in this case. The cross-bill is not a bill for divorce, but a bill to annul a void marriage. A divorce suit is for the purpose of dissolving a marriage which the parties thereto had legal capacity to contract. A nullity suit has for its purpose a decree that a marriage which is void or voidable shall be judicially declared to be void. (14 Am. & Eng. Ency. of Law, 532, 533.) It is well settled the guardian of an insane person can maintain a bill in equity to have declared null the marriage of his ward on the ground of mental incapacity on the part of the ward to assent to the marriage. (7 Ency. of Pl. & Pr. 63, and cases cited in note; *Hancock* v. *Peaty*, 1 P. & D. L. R. 335; *Crump* v. *Morgan*, 3 Ired. Eq. 91; *Waymire* v. *Jutmore*, 22 Ohio St. 271; *Brown* v. *Westbrook*, 27 Ga. 102.) We need not pause to determine whether such a suit could be

maintained by a guardian or conservator to annul a mar-
riage merely voidable, for the reason the marriage here
under consideration was void *ab initio.*

It is urged with great earnestness that the circuit
court, which rendered the decree, was without jurisdic-
tion to adjudicate as to the insanity of said James M.
Pyott, Sr. The position of counsel seems to be, the issue
of insanity having been raised by the pleadings the cir-
cuit court should have suspended further proceedings,
and directed an inquisition, in conformity to the common
law or under the provisions of chapters 85 or 86 of the
Revised Statutes of the State of Illinois, should be had
and taken and the sanity of said Mr. Pyott, Sr., deter-
mined and the result certified to the circuit court, and
that, at all events, it was essential the issue of insanity
should have been submitted to and determined by a jury.
After an inquisition and appointment of a conservator for
an insane person under the statutory provisions on the
subject, all suits and proceedings in behalf of the lunatic
should be brought by the conservator, unless the inter-
ests of the conservator are adverse to those of his ward,
or for other sufficient reason the court shall deem it better
to appoint some other person as next friend to appear
for, counsel, prosecute or defend for such insane person.
(16 Am. & Eng. Ency. of Law,—2d ed.—p. 601; Hurd's
Stat. 1899, chap. 86, sec. 13, p. 1132.) Before such inquisi-
tion, the rule which now obtains in both England and the
United States is, that a lunatic may sue in his own name
by some proper person appointed or recognized by the
court as the next friend or guardian *ad litem* for the insane
person. (16 Am. & Eng. Ency. of Law,—2d ed.—600.)
When the mental capacity of a party to a proceeding
arises for determination as an issue in a case in chancery,
(other than bill to contest a will,) the better practice is to
cause the question of sanity to be submitted to a jury for
an advisory verdict; but the court is not without jurisdic-
tion to hear and determine the question without a jury,

and even upon verdict rendered by a jury the court may decline to accept the finding of the jury and decide for itself the issue, upon the evidence presented in the case. (*Brown* v. *Miner*, 128 Ill. 148.) The statute controls the course to be pursued in a case in equity to contest a will, but in cases of that character the issue of insanity may, by agreement of parties, be determined by the court without the intervention of a jury. (*Whipple* v. *Eddy*, 161 Ill. 114.) It is entirely competent for the court, in a separate maintenance proceeding, to entertain a cross-bill for a decree annulling the marriage. (7 Ency. of Pl. & Pr. 99.).

It is not necessary we should refer to many other matters which have been argued in the brief of counsel, for the reason, the marriage in question being void, the other matters referred to become immaterial.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*