(No. 17966.—Reversed and remanded.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* RUSSELL T. SCOTT, Plaintiff in Error.

*Opinion filed June 22, 1927.*

1. CRIMINAL LAW—*effect of finding of insanity under section 13 of division 2 of Criminal Code.* A verdict and judgment finding that a defendant has become lunatic or insane under section 13 of division 2 of the Criminal Code is a finding that the defendant is lunatic or insane at the time of the hearing on the question of sanity and is not conclusive evidence of his lunacy or insanity at any other day or date, but the judgment affords a presumption in favor of the defendant that he continues thereafter to be lunatic or insane until the contrary is legally established, and the burden is on the People to prove sanity at a subsequent hearing.

2. SAME—*section 13 of division 2 of the Criminal Code contemplates second hearing to determine whether defendant has regained sanity—jurisdiction.* Where a defendant, after judgment and sentence of death, is found to have become insane on a hearing under section 13 of division 2 of the Criminal Code, the question whether he afterwards has regained his sanity may be passed upon by a jury impaneled for that purpose under said section, and the court will acquire jurisdiction of such second hearing by the filing of a petition by the State's attorney and Attorney General, verified by affidavit, and alleging, in substance, that the defendant has been restored to his sanity and that there is no legal reason why the judgment and sentence should not be executed.

3. SAME—*petition for sanity hearing under section 13 of division 2 of Criminal Code should be verified by affidavit.* A petition for a hearing on the question of sanity under section 13 of division 2 of the Criminal Code, whether filed by the defendant or by the People after a former finding of insanity, should be duly verified by affidavit showing that there is some foundation for the facts therein stated.

4. SAME—*statutory provisions for change of venue should be liberally construed.* Statutory provisions for a change of venue should receive a broad and liberal, rather than a technical and strict, construction, and should be so construed as not to defeat the right to change of venue, especially where prejudice is alleged.

5. SAME—*when defendant should be allowed change of venue of sanity hearing.* Where a defendant sentenced to capital punishment has been found insane at a hearing under section 13 of division 2 of the Criminal Code and the People have petitioned for a second hearing to determine whether the defendant has re-

gained his sanity, the proceeding is civil within the meaning of section 1 of the Venue act, and the defendant should be allowed a change of venue on affidavit that the court is prejudiced against him, where his motion is duly made, verified and filed in accordance with the statute, as the court, in such case, has no right to, pass upon the truth of the facts stated in the motion, and counter-affidavits are not permissible.

6. SAME—*defendant is entitled to guardian ad litem at hearing to determine whether he has regained sanity.* Where a defendant sentenced to capital punishment has been found insane on a hearing under section 13 of division 2 of the Criminal Code and the People have petitioned for a second hearing to determine whether the defendant has regained his sanity, it is proper and necessary for the court to appoint a guardian *ad litem* who has the ability and inclination to properly represent the defendant, although it is not necessary that the defendnt's attorney be appointed, as requested.

7. SAME—*when court should remove a guardian ad litem appointed for defendant at hearing to determine whether he has regained sanity.* Where a defendant sentenced to death has been found insane, at a second hearing to determine whether he has regained his sanity the court should remove a guardian *ad litem* appointed for the defendant where the guardian *ad litem* has indicated a hostile attitude by refusing to sign and verify the defendant's petition for a change of venue.

8. SAME—*when counsel should not refer, in cross-examination and argument, to defendant's motion for change of venue in sanity hearing.* At a hearing to determine whether a defendant sentenced to death and afterwards found insane has regained his sanity, it is error to permit cross-examination of one of the defendant's expert witnesses by reading the defendant's affidavit for change of venue and asking the witness to base an opinion of sanity thereon; nor should the prosecuting attorney, in argument, refer to the motion for change of venue as attacking the integrity of the trial judge, especially where the guardian *ad litem* appointed for the defendant refused to sign and verify the motion for change of venue and the court refused to appoint another guardian *ad litem.*

9. SAME—*report of physicians to Department of Public Welfare not admissible in sanity hearing.* At a hearing to determine whether a defendant sentenced to death and afterwards found insane has regained his sanity, it is error to introduce in evidence a report of physicians in the service of the Department of Public Welfare finding that the defendant had regained his sanity, said report being based upon an examination of the defendant at the asylum for criminal insane, as such report, whether verified or not, is not admissible under any issue in the case.

10. SAME—*court cannot appoint expert witnesses to examine defendant as to his sanity.* At a hearing to determine whether a defendant sentenced to death but subsequently found insane has regained his sanity, the court cannot appoint expert witnesses to examine the defendant with a view to qualifying them to testify as the court's witnesses for or against the defendant, and it is error to permit the prosecution to show by such witnesses that the defendant refused to allow them to examine him touching the matter of his sanity.

11. SAME—*when defendant may sue out writ of error to review judgment in sanity hearing.* At a hearing to determine whether a defendant sentenced to death but subsequently found insane has regained his sanity, although there is no judgment of the court, in accordance with the verdict, finding that the defendant is sane, the only order entered by the court being an order fixing the date of execution after overruling a motion for a new trial, the defendant is entitled to sue out a writ of error to review the order as a final determination of the cause.

12. WORDS AND PHRASES—*meaning of the word "suit."* The word "suit," in a legal sense, is an attempt to gain an end by legal process.

13. SAME—*what is meant by "due process of law."* The terms "law of the land" and "due process of law" are synonymous and extend to every proceeding which may deprive a person of liberty or property, whether the process be judicial, administrative or executive in its nature.

14. VENUE—*special statutory proceedings are civil suits within meaning of Venue act.* Special statutory proceedings are civil suits within the meaning of section 1 of the Venue act.

15. APPEALS AND ERRORS—*what is final judgment within meaning of Practice act.* The words "final judgment," as used in the Practice act, providing that only final judgments can be appealed from or reviewed by writ of error, mean a definite sentence or decision of the court by which the merits of the cause are determined.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. MARCUS KAVANAGH, Judge, presiding.

WM. SCOTT STEWART, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, and MERRILL F. WEHMHOFF, (GEORGE E. GORMAN, EDWARD E. WILSON, and CLARENCE E. NELSON, of counsel,) for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Plaintiff in error, Russell T. Scott, (hereinafter referred to as the defendant,) was tried and found guilty by a jury in the criminal court of Cook county of the murder of Joseph M. Maurer. The jury by its verdict fixed the punishment at death, and the court on February 14, 1925, entered judgment and sentence that he be hanged by the neck until dead, between the hours of sunrise and sunset on April 17, 1925. Thereafter a writ of error for the review of the judgment was by this court denied. The Governor postponed the day of execution until July 24, 1925. On that day Thomas H. Scott, father of the defendant, filed his verified petition in said court alleging that the defendant had become lunatic and insane since the judgment was entered against him and was then incapable of realizing or comprehending the fact that he was under sentence of death, prayed that the execution of the death sentence be stayed, and that a jury be impaneled, as provided by the statute, to determine the question whether or not the defendant had become lunatic or insane since the judgment and sentence of death had been entered against him. The criminal court thereupon entered an order staying the execution of the judgment and sentence and impaneled a jury, as provided by section 13 of division 2 of the Criminal Code, to determine the question whether or not the defendant had become lunatic or insane since the judgment and sentence of death had been entered. The jury in that proceeding found by their verdict that the defendant had become lunatic or insane since February 14, 1925, and that at the time of the impaneling of the jury he was lunatic or insane. The criminal court thereupon entered judgment on the verdict, finding that the defendant had become lunatic or insane since February 14, 1925, and that he was at the time of the impaneling of the jury lunatic or insane, and ordered that he be taken by the sheriff of Cook county to the asylum for the criminal insane at Chester, there to be

confined in accordance with the statute until he recovered from such lunacy or insanity, at which time he should be returned to the custody of the sheriff of Cook county and immediately thereafter be brought before the bar of that court to be then and there sentenced to be hanged by the neck until dead, at some time to be fixed by the court, in accordance with the original judgment entered against him on February 14, 1925. The court further ordered that the judgment and sentence of death against the defendant be stayed until his recovery from such lunacy or insanity. The defendant was in accordance with that judgment delivered by the sheriff of Cook county to the asylum for the criminal insane at Chester, and there remained until May 25, 1926. In May, 1926, during the time the defendant was in the asylum, Dr. Herman M. Adler, the State criminologist, Dr. Ralph Hinton, superintendent of the State Hospital at Elgin, and Dr. Frank Stubblefield, superintendent of the asylum for the criminal insane at Chester, were ordered by Chauncey Jenkins, director of the Department of Public Welfare, to examine the defendant, and were given a report already prepared for them to sign after they had made their examination. Those doctors proceeded to the asylum, examined the defendant and signed the report on May 18, 1926, which is to the effect that having been directed to examine Russell T. Scott, who was then confined in the asylum for criminal insane, they "find that the said Russell T. Scott has recovered from his insanity or lunacy."

On May 22, 1926, the Attorney General of Illinois and the State's attorney of Cook county filed a petition, verified by affidavit, in the criminal court of Cook county for a writ of *habeas corpus ad subjiciendum*. The petition alleged that petitioners were in receipt of a report of three doctors, Adler, Hinton and Stubblefield, which was copied in the petition, setting forth that the defendant had recovered from his insanity or lunacy. The record does not disclose that the doctors' report was ever verified by the affi-

davit of any one of the three doctors. The petition also alleged that there was no legal reason why the sentence of death theretofore entered against him should not be executed. The writ was awarded, and in pursuance thereof the defendant was produced before the criminal court of Cook county and was ordered by the court into the custody of the sheriff. On the same day the defendant was again brought before the court and William Scott Stewart was appointed as his attorney. The attorney then appeared specially for the defendant and objected to the jurisdiction of the court, but his motion was overruled. The court also overruled the motion of the attorney to remove the defendant from the custody of the sheriff. The Attorney General and the State's attorney petitioned the court to vacate the order staying the execution of the sentence theretofore entered by the court and to set a definite date for the carrying out of the sentence of death against the defendant. This petition was not verified by the affidavit of anyone and no evidence *aliunde* the petition was presented to the court as a basis for a trial by jury to try the question as to whether or not the defendant was sane. The petition set out no facts showing that the defendant was then sane or had recovered his sanity. However, it did recite that they were in receipt of the unsworn report of the three doctors heretofore mentioned, and the allegations were substantially the same as those contained in the petition for *habeas corpus.* The defendant, by his attorney, objected to the court taking jurisdiction and inquiring into the question whether or not the defendant had recovered from his insanity or lunacy. The hearing on the petition of the Attorney General and the State's attorney was assigned to Judge Marcus Kavanagh, one of the superior court judges of Cook county and *ex-officio* judge of the criminal court of Cook county. The attorney for the defendant then filed a motion before the court requesting that he be appointed as guardian *ad litem* for the defendant. The court denied this motion,

and then, over the objection of the defendant's attorney, appointed a deputy clerk of the criminal court, who was the minute clerk of that court, as guardian *ad litem* for the defendant. A petition for a change of venue from Judge Kavanagh was prepared for the defendant by his attorney and presented to the guardian *ad litem* for his signature and verification. The guardian *ad litem* refused to sign and verify the petition, and thereafter a petition for a change of venue was filed by the attorney for the defendant, which was verified by the defendant and supported by the affidavits of two other persons. It was set out in the petition for a change of venue, as grounds therefor, that the judge was prejudiced against the defendant, and that the knowledge of the prejudice of the judge did not come to the defendant until the judge appointed his own minute clerk as guardian *ad litem* for the defendant and the guardian *ad litem* refused to sign the petition for a change of venue. The petition further set forth that the judge was a party interested in the proceedings. The court denied the motion for a change of venue. Thereafter a jury was impaneled and evidence was heard before the court and jury on the question whether or not the defendant had recovered from his lunacy or insanity. The jury found that the defendant was sane at the time of the impaneling of the jury. The court overruled a motion for a new trial and entered a final order in this language: "It is ordered that the date of execution be and the same is hereby set for the fifteenth day of October, A. D. 1926, between sunrise and sunset," to which order of the court the defendant by his counsel then and there excepted. The defendant was allowed sixty days in which to file his bill of exceptions. The record is brought to this court for review on a writ of error, which was made a *supersedeas.*

On the trial of the defendant on the question whether or not he was lunatic or insane at the time of the impaneling of the jury, three doctors who had examined him testi-

fied, in substance, for the State that he was sane. They based their testimony upon conversations with the defendant on May 17 and 18, 1926, and their ocular inspection of him at those times. They made no physical examination of him whatever and requested of the defendant no such examination. Two of these doctors, Stubblefield and Hinton, were the same doctors who had signed the report to the Department of Public Welfare on May 18, 1926. The other witness was Dr. Paul Schroeder, an assistant to Dr. Adler, the State criminologist. Dr. Hinton had never seen the defendant but once previous to that examination, which was at the time of his former trial for insanity, which was a short time after February 14, 1925. He was a witness in that first trial but only testified in answer to hypothetical questions, as he had never examined the defendant. Dr. Stubblefield had observed and talked with the defendant from time to time while he was in the insane asylum at Chester. Dr. Schroeder made a physical and mental examination of defendant on October 30, 1925. On December 14, 1925, he made a mental examination of the defendant upon ocular inspection of him and conversations with him at that time. Dr. Harold Singer testified, in answer to hypothetical questions, that in his opinion the hypothetical man was sane. Drs. Francis Gerty and James C. Hill testified, over the objections of the defendant, that preceding this trial they were appointed by the court to examine the defendant, with Dr. Ralph Hamill, and to report to the court. Their testimony was, in substance, that they went to the jail for the purpose of examining the defendant but that he refused to submit to an examination in the absence of his attorney or father. They therefore declined to answer any hypothetical questions asked by the State's attorney. Clyde F. Martin, chief guard at the insane asylum at Chester during the time the defendant was there, and Elmer E. Moore and Robert R. Householder, guards in the Cook county jail during the time the defend-

ant was in jail preceding this trial, testified that from their observations and conversations with him during those times, in their judgment the defendant was sane. G. W. Staley, a guard at the asylum at Chester during the time the defendant was there, identified ten letters delivered to him by the defendant to be mailed, one of which was directed to his attorneys and the others to his wife, father, mother and sister, none of which were delivered or mailed to the parties to whom they were addressed but were delivered by the witness to Dr. Stubblefield, the superintendent of the asylum. All of these letters were introduced in evidence over the objections of the defendant. This witness also testified that from his observations of and conversations with the defendant during the time he was at the asylum he believed he was then sane.

Four doctors, and Thomas H. Scott, the defendant's father, testified on behalf of the defendant in substance as follows: Dr. Harold S. Hulbert, a mental specialist of Chicago, examined defendant five or six times between May, 1926, and the time he testified. He made a physical, neurological and mental examination of the defendant. He tested his sputum, urine, blood and cerebrospinal fluid. His mental examination consisted of the army Alpha test and other memory tests. From his examinations and observations of the defendant he was of the opinion that he was insane at the time of the trial, and that the cause of his insanity was the deprivation of alcohol and drugs, which he had used excessively for a number of years, during the time he was in jail and in the asylum. Dr. Rosalie M. LaDova, a specialist on mental diseases, made physical, neurological and mental examinations of the defendant on June 2, 3 and 21, 1926, while he was in jail in Chicago. She also obtained his family history and conversed with him on various subjects, and, basing her opinion on her examinations, conversations and family history of the defendant, stated that it was her opinion that he was insane

at the time of the trial. Dr. Dennis D. Russell examined the defendant preceding his first trial for insanity before Judge David, which was shortly after he was sentenced in the criminal case, and again two days before the doctor testified in this case. His examination was confined principally to the defendant's mentality, and his opinion was that he was insane. Dr. Orlando F. Scott, an expert in mental diseases, made three examinations of the defendant, the last being on May 26, 1926. His examinations consisted of physical tests and neurological tests. He talked with the defendant, who told him of his past life, particularly his business career, in which he boasted of his ability as a financier. He also questioned the defendant and his mother and father concerning his family history. The defendant told him, and his examinations proved the fact to be, that he was a drug and alcoholic addict. Basing his opinion on his examinations, observations and the family history, he testified that the defendant was insane at the time the jury was impaneled and at the time he testified. Thomas H. Scott, father of the defendant, gave a history of the defendant's various occupations and his business failures and use of alcohol and drugs, and stated that just before he got into this trouble he was drinking and using dope to excess. He also identified four letters that he had received from the defendant while he was in the asylum at Chester, which were introduced in evidence and which were mailed by Staley, the guard in the asylum to whom the defendant delivered all of his letters that he asked to be mailed.

In view of our decision in this case it will not be proper to discuss the merits of the evidence, the substance of which is only very briefly stated for the purpose of showing that there was a question of fact that should have been decided by the jury after a fair and impartial consideration thereof, untrammeled by the misconduct of the prosecutor and the errors of the court hereinafter discussed, and it is not

our intention to discuss the evidence except as to the admissibility of certain portions of it, which were questioned by proper objections raised on the trial.

The provisions of the statute under which the two trials to determine the defendant's sanity were had, are in the following language: "A person that becomes lunatic or insane after the commission of a crime or misdemeanor shall not be tried for the offense during the continuance of the lunacy or insanity. If, after the verdict of guilty, and before judgment pronounced, such person become lunatic or insane, then no judgment shall be given while such lunacy or insanity shall continue. And if, after judgment and before execution of the sentence, such person become lunatic or insane, then in case the punishment be capital, the execution thereof shall be stayed until the recovery of said person from the insanity or lunacy. In all of these cases, it shall be the duty of the court to impanel a jury to try the question whether the accused be, at the time of impaneling, insane or lunatic." (Smith's Stat. 1925, chap. 38, sec. 13, p. 947.)

The statute provides that a defendant who is charged with the commission of a crime or misdemeanor may be tried for lunacy or insanity at two different times: First, if he becomes lunatic or insane after the commission of the crime or misdemeanor and before trial for the crime or misdemeanor; and second, if he becomes lunatic or insane after trial and before judgment. The statute also provides for such a trial for a defendant after judgment and before execution, in case the punishment be capital. It is only the provision for the third trial that is material for consideration in this case, as the punishment fixed for the defendant was death by hanging. In the case of *People* v. *Geary*, 298 Ill. 236, we held that in a capital case, where the defendant is tried for such lunacy or insanity after judgment and before execution, there are two questions for the jury to decide, the first being, Has the defendant

326—22

become lunatic or insane since judgment? and the second, Was he lunatic or insane at the time of impaneling the jury? The defendant, as already stated, had such a trial, and the jury by their verdict answered these two questions in the affirmative, and the court on August 6, 1925, entered a judgment on that verdict, finding that the defendant had become lunatic or insane since judgment in the criminal case and that at the time of the impaneling of the jury he was lunatic or insane, and entered the proper order for the defendant's confinement in the insane asylum at Chester until he should recover from such lunacy or insanity. The court made the further order in the case that when he had recovered from such lunacy or insanity he should be returned to the custody of the sheriff of Cook county for sentence on the original judgment in the criminal case, and also stayed the execution of the original sentence until his recovery from such lunacy or insanity. That judgment of the court conclusively settled the questions that the defendant had become lunatic or insane since the judgment in the criminal case and was lunatic or insane at the time of the impaneling or enrolling of the jury, which the record discloses was on August 3, 1925. It is not conclusive evidence of his lunacy or insanity at any other day or date, but the judgment affords a presumption in favor of the defendant that he continued thereafter to be lunatic or insane until the contrary is legally established.

The statute does not specifically provide for a further trial in capital cases after a verdict and judgment that the defendant has become lunatic or insane after judgment and that he was lunatic or insane at the time of the impaneling of the jury, but we think from the various provisions of the statute that it should be interpreted as implying that the question whether or not the defendant has recovered from his insanity or lunacy should be passed on by a jury impaneled for that purpose, as was done in this case. In all the three trials provided for by the statute it is spe-

cifically provided that the main question for determination by the jury is the question whether or not the defendant at the time of the impaneling of the jury was insane or lunatic. In the trial in the lower court the question arose as to what should be the form of the verdict, and it was finally determined by the court that the verdict of the jury should be in one of two forms, to-wit: that the defendant was lunatic or insane at the time of the impaneling of the jury, or that he was sane at the time of the impaneling of the jury. The court also instructed the jury that in determining whether or not the defendant, at the time of the impaneling of the jury, was lunatic or insane they should be governed by this test, only: If he then had sufficient intelligence to understand the nature of the proceedings against him, what he was tried for originally, the purpose of his punishment, the impending fate which awaited him, sufficient mind to know any facts which might exist which would make his punishment unjust or unlawful, and sufficient intelligence to convey such information to his attorney or to the court, then he was to be regarded as sane, otherwise he should be regarded as lunatic or insane, and that the burden was on the People to show, by a preponderance of the evidence, that he was sane as defined by the instructions. There was no complaint by either the State or the defendant as to these determinations by the court, and as they appear to be in conformity with the intention of the statute there was no cause for any complaint.

The defendant's counsel has argued in this court that the criminal court did not have jurisdiction of the defendant because he was out of the jurisdiction of the court at the time the writ of *habeas corpus* was awarded, and that he should have been tried in Randolph county, where he was at that time. There is no merit in this contention. The defendant acquired no residence in Randolph county by reason of his incarceration in the asylum at Chester. He was there by the order of the criminal court of Cook county

and subject to be returned into the custody of the sheriff of Cook county on the order of the criminal court, which was duly and properly entered by that court. The legal place for his execution under the judgment in the criminal case was in Cook county, and no court had jurisdiction to re-try him for lunacy or insanity or to fix the date of the execution of the sentence of the criminal court except that court. The statute on lunatics has no application to a case of this character, and section 30 thereof expressly provides that nothing therein contained shall be construed to apply to insane persons, or persons supposed to be insane, who are in custody on a criminal charge. It was the filing of the petition herein by the State's attorney and Attorney General, alleging, in substance, that the defendant had been restored to his sanity and that there was no legal reason why the judgment of the criminal court should not be executed, that gave the criminal court the jurisdiction to try the question of the sanity or insanity of the defendant. This petition, which constituted the People's declaration in this case, was not demurred to or otherwise attacked for insufficiency before the entry upon the legal determination of the question whether or not the defendant was lunatic or insane. All formal objections thereto are therefore waived. Good practice and sound reason demand that such a petition under said section by the People, or any petition thereunder by the defendant, shall be duly verified by affidavit or affidavits showing that there is some real foundation for the facts therein stated, and we so held in the case of *People* v. *Geary, supra.* The same rule in this regard that we applied to the defendant in the *Geary case* should also apply to the People in any similar case, as the former judgment and finding that defendant was insane carries with it the presumption that he continues to be insane until the contrary is legally established.

The contention of the defendant that the court erred in overruling his motion for a change of venue must be sus-

tained. The presiding judge ruled that the defendant was
not entitled to a change of venue because this suit was not
a criminal suit or proceeding and was not a civil suit or
proceeding in law or in equity, and that he, as such presid-
ing judge, was not, in fact, prejudiced against him. The
authority to change the venue of either civil or criminal
cases under appropriate circumstances existed at common
law and became a part of our judicial system, but under
the common law the bias or prejudice of the judge, either
in a criminal case or in a civil case, was not such a dis-
qualification as gave the parties a right to a change of
venue. (27 R. C. L. 810; *Day* v. *Day,* 86 Pac. (Ida.) 531;
for other cases see note in 10 Ann. Cas. 260.) Where,
however, the legislature has undertaken to prescribe the
cases wherein a change of venue may be had, its directions
should be taken to be conclusive on the subject.

The legislature has prescribed the cases wherein a
change of venue may be had in this State. Section 1 of
our statute entitled "Venue" provides that a change of
venue in any civil suit or proceeding in law or equity, in-
cluding proceedings for the exercise of the right of emi-
nent domain, may be had where the judge is a party to or
interested in the suit, or his testimony is material to either
party, or he is related to or shall have been counsel for
either party to the controversy, or where either party shall
fear that he will not receive a fair trial because the judge
is prejudiced against him. The spirit of our laws demands
that every case, whether a statutory proceeding or other-
wise, shall be fairly and impartially tried, and no judge
should think of presiding in a case in which his good
faith in so doing is open to such serious question as that
presented by this record. These provisions of the statute
should receive a broad and liberal, rather than a technical
and strict, construction, and should be construed so as not
to defeat the right attempted to be attained therein. This
proceeding is not a criminal suit, but it is a civil suit within

the meaning of the first section of the Venue act. The meaning of the word "suit," in a legal sense, is an attempt to gain an end by legal process. (*Dobbins* v. *First Nat. Bank,* 112 Ill. 553.) In the case of *Weston* v. *City of Charleston,* 2 Pet. 464, the term "suit" is said to be a very comprehensive one and to apply to any proceeding in a court of justice by which an individual pursues the remedy afforded by the law. Special statutory proceedings have been held by this court to be civil suits within the meaning of the Venue act. *Quo warranto* was held to be a civil proceeding within the meaning of that act, in *People* v. *Shaw,* 13 Ill. 581, and *Ensminger* v. *People,* 47 id. 384. A proceeding to collect taxes is a civil suit within the meaning of the Venue act. (*People* v. *St. Louis Merchants Bridge Co.* 282 Ill. 408.) A proceeding for the confirmation of a special assessment is a suit within the meaning of the Special Assessment act. (*People* v. *Smith,* 281 Ill. 538.) The defendant's petition for a change of venue was in proper form and duly verified as required by the statute. Under the statute no discretion is given to the court where a petition for a change of venue is made on account of the prejudice of the trial judge. (*Walsh* v. *Ray,* 38 Ill. 30; *Knickerbocker Ins. Co.* v. *Tolman,* 80 id. 106.) This court has never recognized the doctrine stated by the trial court in passing upon this motion, that public policy urgently demands that motions for a change of venue should be denied in cases where the petitions are unjustified. The decisions of this court have at all times been to the effect that the presiding judge has no right to pass judgment upon the truth of the facts stated in the petition or upon the question whether or not he is, in fact, prejudiced against the petitioner. The statute gives an absolute right to a change of venue to the petitioner when his petition is duly made and verified and filed in accordance with the statute.

This case being a civil proceeding, it was proper and necessary for the court to appoint a guardian *ad litem* for

the defendant. The same rule in this regard applies to insane defendants, or those presumed to be insane, as is applicable to minors who have no guardian appointed for them. Minors who have no guardian must be represented by guardian *ad litem* whenever their personal or property rights are involved or all proceedings against them will be erroneous. (*McDaniel* v. *Correll,* 19 Ill. 226; *Mechling* v. *Meyers,* 284 id. 484.) The same rule is applied in cases where it is represented that the defendant is insane. (*Pyott* v. *Pyott,* 191 Ill. 280.) The record recites that there was no objection to the judge appointing his minute clerk as defendant's guardian *ad litem,* but it does show that there was a motion made by the defendant's attorney to remove such guardian *ad litem* and that such motion was over-ruled. The guardian *ad litem* refused to sign the petition prepared by the defendant for a change of venue, and this was one of the grounds for the motion for removal. The guardian *ad litem* also filed a counter-affidavit, in which it was alleged that the judge was not prejudiced against the defendant. Such counter-affidavits are permissible at no time. The guardian *ad litem* could not be compelled legally to file a petition for change of venue, verified by his affidavit, if he did not believe that the judge was prejudiced against the defendant. It was his duty, however, to re-sign as such guardian *ad litem* if he could not conscientiously file the affidavit, and allow the court to appoint a fair and impartial guardian *ad litem* for the defendant. The court was not bound to appoint the defendant's attorney as the guardian *ad litem,* but it was his duty to appoint a guardian *ad litem* who had the ability and inclination to properly represent the defendant in the suit. In view of the foregoing we think the court erred in not removing the guardian *ad litem* and appointing another who was not hostile to the defendant and who was willing to sign and verify a petition for a change of venue if reasonable grounds therefor were disclosed to him. It is the spirit of all de-

cisions on this question that a minor or insane plaintiff or defendant should only be represented in a suit by one who is friendly to him and who can and will act in his interest all through the case, and it is the court's duty, in every instance, to remove such a representative where it appears that the incompetent's interests may be jeopardized or prejudiced.

The court also erred in permitting the prosecuting attorney, while cross-examining one of the defendant's expert witnesses, to read the affidavit of the defendant for a change of venue in the presence of the jury and to ask the witness whether or not that affidavit was the product of an insane mind, and also to inquire whether or not the statements therein made were delusions or sincere expressions of the defendant's belief that the judge was prejudiced against him. This examination was very prejudicial to the defendant. The fact that he had petitioned for a change of venue was not a matter for proper consideration by the jury, and it certainly was not a proper matter for the cross-examination of the expert. The court, however, allowed this cross-examination over the objections of the defendant's attorney, and when the witness answered that it sounded very legal to him and that he had no opinion on a legal document, the court said to him, "No; he is not asking you as to the legal form; he is asking about the fact that is in there." The witness answered that it was rather confusing. The court then further said, "Well, is that a delusion or do you believe it to be a fact?" And the witness finally answered, "I believe it is his belief, and I don't see any delusion about it." The court's cross-examination was equally objectionable, in every sense, as that of the prosecutor.

The whole conduct of the prosecuting attorneys, as shown in this record, manifests a disposition on their part to use the present proceeding to correct what they interpret as a miscarriage of justice in the previous hearing

on the question of the lunacy or insanity of the defendant. Throughout their argument to the jury they insisted that the previous jury had been "hoodwinked" and misled by paid alienists, whom they characterized as "hired charlatans," and the cleverness and unscrupulousness of the defendant's attorney. They refused to recognize the former verdict of lunacy or insanity as having any significance or standing whatever, and shaped their whole argument to the jury with a view to have them understand that their particular duty and purpose in this case was to correct such miscarriage of justice by bringing in a verdict that the defendant was sane.

The court also erred in admitting in evidence the report of the three doctors (Adler, Hinton and Stubblefield,) to the Department of Public Welfare. This report was not required of the doctors by reason of any official positions they had, and its contents can only be classed as hearsay evidence. Two of these physicians testified on the trial, and the State was entitled to the testimony of Dr. Adler, the third one of those doctors, if it desired his testimony, but it was not entitled to put in evidence before the jury their report, which was not even verified, and, if it had been verified, was inadmissible under any issue in this case.

The court also erred in permitting the State to show by the doctors appointed by the court to examine the defendant that he refused to allow them to examine him touching the matter of his insanity. This was a privilege that the law guaranteed to the defendant. There is no law in this State that authorizes or permits a court, either on his own motion or on motion of a party to any civil suit or proceeding, to appoint alienists to examine a defendant or a party to such a suit with a view of qualifying them to testify as the court's witnesses for or against such party as to his mental or physical condition. There was no necessity for such action on the part of the court in this case even if such action of the court might, in any view of it,

be recognized as proper. The defendant had already been examined by four alienists for the State who were unquestionably competent to make such examination, and the evidence of such experts was available. The Supreme Court of Michigan held invalid a law of that State which gave trial courts power to appoint alienists in criminal cases to examine defendants and to testify as the court's expert witnesses where the issues involved expert knowledge or opinion. There are several reasons assigned by that court why such a statute is invalid as invading the constitutional right as well as the common law right of every defendant put on trial in a criminal case that are not applicable in a civil proceeding, but the court does assign some very strong grounds for holding the statute invalid that are applicable to civil proceedings. Among them are the following: "This is an idle provision, [referring to the statute,] for, in the face of the certificate of character, fitness and ability given to the court experts by the court, experts summoned by either side would receive but scant consideration at the hands of the jury. Their testimony would be swept aside in a breath. Juries are most anxious to ascertain the opinion of the court as to the guilt or innocence of the accused, and, ordinarily, more than willing to adopt that opinion as their own. Trial courts, therefore, in doubtful cases have jealously guarded their own opinions, in order that juries might determine controlling facts uninfluenced by the mental attitude of the judge. The expert witnesses provided for by this section testify under a sanction which gives to their testimony practically the same weight as if it were delivered by the court itself, and if that testimony, being against the accused, were either willfully false or ignorantly mistaken, its baneful results would be appalling. To give to the testimony of a witness or witnesses this extraordinary certificate of candor, ability and truthfulness, while the other testimony in the case must be judged by the jury by ordinary standards, is to subvert the very

foundations of justice." *People* v. *Dickerson*, 129 N. W. (Mich.) 199.

It is apparent that if the court were permitted, either on his own motion or on that of the People, to select experts to examine a defendant as to his sanity, it would not be possible to keep the fact from the jury that they were the court's witnesses selected for such purpose, and it would not be possible to keep the prosecutor from arguing to the jury that they were the really fair witnesses and the only fair and competent witnesses testifying on such question, and that an inquiry into the sanity of a defendant in that manner would be simply a farce. Indeed, if it were proper for the court to select witnesses for such purpose it would be proper for the jury to know that they were so selected. This court has condemned the practice of trial judges permitting a defendant in a personal injury suit to ask a plaintiff whether or not he would be willing to allow its expert witnesses to make a physical examination of him as to his injuries with a view of testifying from that examination, and has held that it is the settled law of this State that the plaintiff in an action of that kind cannot be required to submit to a physical examination as to his injuries, and that it is simply an invasion of that rule to permit a defendant to be asked to state to the jury that he is or is not willing to submit to such an examination, and that to permit such a question to be asked in the presence of the jury practically compels him to submit to the examination because of the unfavorable effect likely to be produced upon the minds of the jury if he refuses. *Mattice* v. *Klawans*, 312 Ill. 299.

Complaint is justly made of the prejudicial attitude of the court in cross-examining the defendant's witnesses. During the cross-examination of Dr. Hulburt, one of the experts for the defendant, the court of his own motion conducted the following examination:

The court: "How about this man? If this man had made an escape and had gotten revolvers was he dangerous?

A. "I think so.

Q. "He would kill, would he?

A. "More easily than a normal person.

Q. "Well, he would kill, wouldn't he, if someone sent him revolvers down there?

A. "I don't think he would hunt up Sir John to kill him.

Q. "How about a guard; if he was making an escape would he kill the guard?

A. "I think so.

Q. "Kill the guard? So that if he is sane and you are mistaken about it and Dr. Singer is right, if he got revolvers he would kill and if he is insane he would kill. If Dr. Singer testified he is sane and Dr. Singer is right, then he would kill anyhow, wouldn't he?

A. "I think so.

Q. "So that whichever way, sane or insane, this man would kill?

A. "I think he is a dangerous man."

Dr. Singer did not testify as to any fact concerning the defendant within his personal knowledge. He merely testified as an expert in answer to hypothetical questions. The court's examination was altogether unfair, and is just such an examination as a jury would accept as an indication by the court that their verdict should be against the defendant because of the fact that he was a killer, whether sane or insane.

Complaint is made by the defendant's attorney that the prosecutors were allowed to make an unfair and prejudicial argument to the jury to the effect that the defendant's counsel had sought to obtain a change of venue from the presiding judge, and that his action in so doing was purely a vicious assault upon the integrity of the judge; and that they were allowed to read to the jury, in their argument, the petition for a change of venue and to make an argument

in favor of the judge's integrity and fairness in the trial of cases, in answer to such alleged and vicious assault upon his integrity and fairness. The prosecutors did read to the jury in their final argument the petition for change of venue, and their argument is in part as follows:

"There is evidence of the crooked scheme that is being built up here by Stewart, the lawyer, about Scott, the alleged lunatic, to fool this jury as they fooled the jury last August. There is no more sincerity in what they are presenting to this jury as a basis for finding this man insane than there is evidence of insanity in the letters that Scott wrote. Scott went down there on the same sort of a mission that Gene Geary went down there, but doctors have never reported that Gene Geary was sane. That sort of an appeal is made, and on top of that a purely vicious assault upon the integrity of the judge of this court by a man that Stewart says is insane, and Stewart presents a petition of what he says is an insane man attacking the integrity of the judge before whom this case is tried. Gentlemen of the jury, it is not necessary for me or anybody else to say anything about Judge Kavanagh. I saw him trying cases before he was a judge, helped in the trial of some of them; I saw him march away at the head of the regiment to the Spanish-American war, a sturdy, vigorous, brawny young man; saw him come back and go upon the bench; and every election day shows by the increased majority with which he is elected the increased affection of the people of this county in this man that presides over this trial, and yet Stewart does not hesitate to come into this court with a petition sworn to by a man that in one breath says he is insane, and asks upon the petition of an insane man to cast a slur upon the name and reputation of one of the best judges in this county,—one who, if I may be permitted to indulge in this reminiscence, for years I have associated, and I think the people do, in affectionate reverence with Gibbons, Windes, Tuley, Gary, and those distinguished

judges of the past whose conduct on the bench maintained the standard of our judiciary at the highest, and I say it ill becomes Scott Stewart to inject the affidavit of what he says is an insane man into this case to create a feeling in the minds of the jury who is going to hear the case that he is not getting a square deal from the judge, that everybody is against him, and finish with an appeal to sympathy, pity and passion, that he hopes will result, with the other arts that have been indulged in this case, to fool this jury as they fooled the jury that listened to the case [the former trial of the defendant for insanity] before Judge David."

Without regard to what were the actual merits of the former verdict and judgment that the defendant was lunatic or insane, that judgment, as we have already indicated, carries with it the presumption that the judgment and verdict were correct and that the defendant continued to be lunatic or insane up to the trial of the case that is now before us for review. The defendant being presumed to be insane until the contrary was established, it was the duty of the court to appoint a guardian *ad litem* of the character we have already indicated. The court appointed a guardian *ad litem* apparently in accordance with the view that the record made it his duty to do so. He appointed his own minute clerk as guardian *ad litem,* who refused or declined to accede to the request of the defendant's attorney to sign and verify a petition for a change of venue and filed a counter-affidavit. The court refused to make any further appointment of a guardian *ad litem* or to remove his minute clerk as such guardian *ad litem*. Being placed in this position by the court's action, the attorney was apparently driven to the necessity of having the defendant himself sign and verify the petition for a change of venue that the attorney had prepared or waive his statutory right of asking and petitioning for a change of venue. He and his attorney were then denounced by the unfair and unprofessional argument of the prosecutors for exercising his statutory

right, and were portrayed to the jury, by the language above quoted, as asking for a change of venue for the purpose of making a vicious and unwarranted attack upon the integrity of the trial judge. In other words, the prosecutor dragged into this case, with the court's permission, an issue that was absolutely foreign to any legitimate issue in this case, namely, the integrity and honesty of the judge in denying the petition for a change of venue. The jury no doubt accepted it as a part of their duty to decide the immaterial issue and to exonerate the trial judge from such alleged wanton and unlawful assault, by finding that the defendant was sane without proper consideration of the legitimate evidence bearing upon the real issue in the case.

Our attention is also called to the fact that no final judgment was entered in this case, and it is suggested by the defendant's counsel, in case our decision be that this writ of error be dismissed for want of final judgment, in view of the importance of the issues and the newness of the field, that we indicate the proper procedure to be pursued in this case. We have considered all of the other errors assigned that we deem necessary to be passed on, and we think we have indicated sufficiently by this opinion and the opinion in the *Geary case, supra,* the course of procedure that should be followed in the re-trial of this case. The judgment in this case is a final judgment within the meaning of the Practice act although it is not fully expressed in the judgment of the court. A judgment on the verdict should have been entered by the court in the regular form finding that the defendant is sane, followed by the order that the court did enter, fixing the date of the execution of the defendant by hanging, etc. However, no judgment at all should have been entered on the verdict of the jury in this case, but the court should have granted the motion for a new trial because of the errors that we have already indicated. While the court did not enter the full and formal judgment on the verdict of the jury as above

indicated, the court received and entered the verdict of the jury of record and on that verdict entered the order fixing the date of the execution. The overruling of the motion for a new trial amounted to an approval by the court of the verdict of the jury. When the court received and entered the verdict of the jury finding the defendant sane, it followed as a legal inference that the court found on the verdict that the defendant was sane. The order of the court setting the date of the execution, although technically not a judgment, was a final determination of the cause. Such order was a final order and one upon which a writ of error could be sued out. (*People* v. *Andrae,* 295 Ill. 445; *Hoch* v. *People,* 219 id. 265.) The words "final judgment," as they are used in our Practice act, providing that only final judgments can be appealed from or a writ of error sued out thereon, mean a definite sentence or decision of the court by which the merits of the cause are determined. (2 Ency. of Pl. & Pr. p. 55; 1 Freeman on Judgments,—4th ed.—sec. 16.)

It is apparent from a consideration of this record that the defendant in this case has not had a fair and impartial trial. It is also apparent that he has not had a trial according to the law of the land by a fair and impartial court because of the fact that the presiding judge was not competent to sit in the case on account of his prejudice against the defendant, and because of the further fact that the jury were so unduly prejudiced by the conduct and rulings of the judge and by the misconduct of the prosecutors that they were also rendered incompetent to decide the real issues in the case upon a fair and impartial consideration of the legitimate evidence in the record.

This court decided in the cases of *Haines* v. *People,* 97 Ill. 161, *People* v. *Emmerson,* 294 id. 219, *State* v. *Ajster,* 318 id. 230, *Loomis* v. *Hodson,* 224 id. 147, and *Sweeney* v. *Chicago Telephone Co.* 212 id. 475, that where property rights or personal liberty is involved, independent

of statutory or constitutional provisions, the writ of error lies from this court by force of the common law. The terms "law of the land" and "due process of law" are synonymous, and extend to every proceeding which may deprive a person of liberty or property, whether the process be judicial or administrative or executive in its nature. (*People* v. *Strassheim*, 242 Ill. 359.) Under our statute the defendant could not be deprived of his life during insanity, because if sane he might be able to produce some reason why his punishment would be unjust or cruel, and he was entitled to a trial of that question according to the law of the land. The writ of error, therefore, was a writ of right in this case. A right to a review in this class of cases has been recognized by other States. *People* v. *Moice*, 15 Cal. 329; *Barker* v. *State*, 106 N. W. (Neb.) 450; *Sears* v. *State*, 37 S. E. (Ga.) 443. See, also, note under the case of *Baughn* v. *State*, 38 L. R. A. 577, *et. seq.*

In all that we have said in this case we wish it distinctly understood that we have not even considered the question whether or not the defendant was shown by the legitimate evidence in this case to be sane or insane within the meaning of the statute. What we do mean to indicate by this opinion is that no defendant shall be deprived of life, liberty or property by the approval of this court when he has been denied a trial according to the law of the land. We have had to reverse many cases coming from the criminal court of Cook county for similar unprofessional conduct of the prosecutors there, and we have very recently indicated that we will not hesitate to reverse judgments so obtained and that we place the responsibility for such reversals where it rightly belongs,—upon the prosecutors who habitually and continually engage in such conduct and the courts who permit the same. The trial judges of the criminal court of Cook county have the same powers and duties to prevent such misconduct by proceedings for contempt as have circuit judges in the other counties of the State. It

326—23

is the duty of the courts to use their power to the utmost, if such be necessary, to secure to parties a fair, impartial and decent trial according to the law and evidence.

The judgment of the criminal court is reversed and the cause remanded.

*Reversed and remanded.*