[Crim. No. 607. In Bank.—July 28, 1900.]

In re HUGH BUCHANAN, on Habeas Corpus.

CRIMINAL LAW—INSANITY OF DEFENDANT—COMMITMENT TO ASYLUM PEND-
ING TRIAL—HABEAS CORPUS—RETURN FOR TRIAL.—Where a defend-
ant accused of crime was committed to an insane asylum pend-
ing his trial, if the superintendent of the asylum does not re-
turn him for trial after he becomes sufficiently sane for the
purposes of his defense, this court has the power, and it is its
duty, upon *habeas corpus*, to order him into the custody of the
court where the charge is pending against him.

ID.—QUESTION OF SANITY, HOW JUDGED—CONSTRUCTION OF. STATUTE.—
The question whether the defendant has become sufficiently
sane to be tried is not to be judged according merely to the
medical view of sanity or insanity, but is to be determined with
reference to the statute, which is to be construed as in affirm-
ance of the common-law principle that if a person arraigned for
a crime is capable of understanding the nature and object of
the proceedings against him, and can conduct his defense in a
rational manner, he is deemed sane for the purpose of being
tried, though on some other subjects his mind may be deranged
or unsound.

ID.—UNDERSTANDING OF DEFENDANT—CLAIM OF RIGHT TO TRIAL.—Where
it appears upon the examination had upon *habeas corpus* that
the defendant reasons as other men do, that his memory is
unimpaired, that he fully appreciates the nature of the crim-
inal charge against him, and understands his position relative
thereto, and is master of his own defense, and claims the right
to a trial upon the criminal charge against him, the law sustains
him in his claim.

HABEAS CORPUS in the Supreme Court to A. M. Gardner,
Medical Superintendent of Napa State Hospital for the Insane,
to determine the sanity of Hugh Buchanan, charged with
murder in the Superior Court of Yuba County, and to obtain
his return to said county for trial.   E. A. Davis, Judge.

The facts are stated in the opinion of the court.

Theodore A. Bell, E. L. Webber, and Henry C. Gesford,
for Petitioner.

Tirey L. Ford, Attorney General, for the Respondent.

BEATTY, C. J.—Hugh Buchanan was brought to trial in Yuba county upon an information charging him with the crime of murder. After the trial had been several days in progress it was suspended upon a suggestion that the prisoner was then insane, and a special jury was formed for the trial of that issue. This jury, after hearing evidence and the instructions of the court, brought in a verdict to the effect that the defendant was insane, upon which he was committed to the insane asylum at Napa, now known as the Napa State Hospital, where he is still confined by Dr. A. M. Gardner, the medical superintendent of that institution, without other authority than said commitment. The proceedings in the superior court following the suggestion of the prisoner's insanity were those prescribed in sections 1367 to 1373 of the Penal Code, and the commitment conformed to the statute in directing the detention of the defendant in the insane asylum only until he should be sane (Pen. Code, sec. 1370), in which event it would become the duty of the superintendent to give immediate notice to the sheriff of Yuba county, and of the sheriff to return the prisoner without delay to the proper custody in order that the court might proceed with his trial. (Pen. Code, sec. 1372.)

It is now claimed in behalf of the prisoner that he has been for several years past entirely restored to sanity, and that his retention at the asylum has become unlawful. It is not claimed that he should be set at liberty, but that he should be returned, as the law provides, to the proper custody of the sheriff of Yuba county, and that he should have a speedy trial upon the charge of murder there pending against him.

There is no controversy, and none is possible, as to the soundness of this conclusion, if the prisoner has really become sane; but it is strongly insisted in behalf of the officers of the asylum not only that he is not sane, but that he can never become so, and this is the sole question now to be determined upon the voluminous record of conflicting evidence submitted at the hearing upon the return to our writ of *habeas corpus*.

A number of the more important questions originally pertaining to this controversy were finally determined in the case of *Gardner v. Jones*, 126 Cal. 614. That was an original ap-

plication to this court by the superintendent of the insane asylum for a writ of prohibition to the judge of the superior court, to prevent the hearing of a petition in behalf of Buchanan for the same relief sought in the present proceeding. It was there contended that the insanity law of 1897 (Stats. 1897, p. 311) has made the superintendent of the asylum the sole and final judge, in a case of this kind, whether the prisoner has become sane, and that the courts no longer have the power to conduct the inquiry by *habeas corpus*, or otherwise. It was held against this contention that the question of unlawful restraint of the liberty of a citizen is, and must be as long as our present constitution endures, a judicial question to be determined by the courts, and that the statute referred to would be unconstitutional if it required the construction contended for. The statute, however, was construed to mean nothing more than this: That it is the duty of the superintendent to send back a prisoner committed under sections 1367 to 1372 of the Penal Code as soon as he becomes sane, in order that the court may proceed to trial or judgment in his case; but if he does not do so the prisoner may assert his right to a speedy trial by means of the writ of *habeas corpus*, and that if the court after a hearing concludes that the prisoner is sane it has the power, and it is its duty, to order him into the custody of the court where the charge against him is pending, in order that that court may bring him to trial or pronounce judgment. In consequence of this decision the superior judge proceeded with the hearing upon return to the writ of *habeas corpus* issued by him, and having concluded upon the evidence that Buchanan was still insane, made an order remanding him to the custody of Dr. Gardner. Thereupon the present proceeding was commenced in this court, and upon the same evidence submitted to the superior judge, and some additional testimony, we must now decide the question of fact whether Buchanan has become sane.

The question, however, is not whether he has become sane in every sense of the word, but whether he has become sane in the sense of the statute, which requires a suspension of the proceedings in a criminal cause whenever it is found that the defendant is presently insane. In other words, if there is a dif-

ference between the medical view of insanity and the view
upon which the statute is founded, the question of sanity or
insanity is to be determined with reference to the latter as
contradistinguished from the former view. That there is such
a difference is notorious, and is clearly illustrated by the testi-
mony in the present case when compared with the origin and
reason of the statutory provisions. These provisions estab-
lish nothing new in criminal procedure. They merely put in
statutory form a well-known regulation of the common law—
a regulation applicable to lunatics or madmen. Blackstone, in
his Commentaries, after stating the rule that idiots and lunatics
are not chargeable with their own acts, continues as follows:
"Also, if a man in his sound memory commits a capital offense,
and before arraignment for it he becomes mad, he ought not
to be arraigned for it; because he is not able to plead to it with
that advice and caution that he ought. And if, after he has
pleaded, the prisoner becomes mad, he shall not be tried—for
how can he make his defense? If, after he be tried and found
guilty, he loses his senses before judgment, judgment shall
not be pronounced, and if after judgment he becomes of non-
sane memory execution shall be stayed, for, peradventure,
says the humanity of the English law, had the prisoner been
of sound memory he might have alleged something in stay of
judgment or execution." (4 Blackstone's Commentaries, 24.)

This short quotation shows what all the books and treatises
and decisions on the subject show that the true and only reason
why an insane person should not be tried is "that he is disabled
by the act of God to make a just defense, if he have one."
When the rule became a part of the common law, modern views
of insanity were unknown. No sort of insanity was recognized
except that which manifested itself in mental deficiency or in
mental derangement. A congenital idiot, or a raving lunatic,
was understood to be insane, but in the absence of any sensible
loss of memory or material impairment of the intellectual
faculties, a man was counted sane. If he could remember
events and could reason logically, he was not within the letter
or the reason of the rule which suspended proceedings against
a madman or a lunatic. And if he was not within the common-
law rule neither is he within the rule of the statute, which

merely re-enacts the common law and had no other purpose than to suspend proceedings against a defendant who is by reason of mental infirmity incapable of making his defense. A similar provision in the law of New York was very thoroughly considered in the case of *Freeman v. People*, 4 Denio, 9,[1] where the court, upon an elaborate review of the authorities, stated its conclusion as follows: "The statute is in affirmance of the common-law principle, and the reason on which the rule rests furnishes a key to what must have been the intention of the legislature. If, therefore, a person arraigned for a crime is capable of understanding the nature and object of the proceedings against him; if he rightly comprehends his own condition in reference to such proceedings and can conduct his defense in a rational manner, he is, for the purpose of being tried, to be deemed sane, although on some other subjects his mind may be deranged or unsound."

If this is the true construction of the New York statute, as I have no doubt it is, it is equally the true construction of our own, and it is very plain from the evidence before us that Buchanan is not now, and has not been for several years, insane in the sense of the statute. The evidence all shows that he is in possession of every faculty requisite to the defense of the accusation against him. His memory is unimpaired, and his reasoning faculties, although they may not be equal to the promise of his youth, are far above those of the average man. His insanity is of a character which does not manifest itself in any apparent weakness of intellect or failure of memory, but may be best described as a sort of chronic and latent disease of the brain, which under the excitement of intoxicating drink, to which he is predisposed, will lead him to the commission of criminal acts. To be more specific, it appears that until he was about twenty years of age he was particularly intelligent and precocious and distinguished by many amiable traits of character. About that time he began to indulge in the excessive use of intoxicating drink, the consequence of which was a serious illness which undoubtedly affected his brain. Upon his recovery, or partial recovery, after a protracted period of convalescence, it was discovered that his character was

[1] 47 Am. Dec. 216.

greatly changed. He had lost all ambition to excel in his chosen profession; he had become aimless and trifling; his moral character had deteriorated; he was alienated from his family and took up the life of wanderer, going about from place to place and supporting himself by menial employments. At frequent intervals his appetite for intoxicants became uncontrollable, and when drinking he was disposed to acts of violence, besides being subject to occasional temporary delusions. The medical testimony based upon these facts is that his brain or its integument was permanently injured by the sickness above mentioned, and that his condition has been such ever since, and will so remain as long as he lives; that if set at liberty he will inevitably take to drinking, and that under the influence of intoxicants he will be dangerous. There is a very strong preponderance of expert testimony to this effect, and we cannot doubt that the medical gentlemen who have so testified are competent to decide such matters.

But this is a species of insanity which the statute governing this case does not contemplate. It is not such insanity as would disable him to make his defense. The same witnesses that testify that he is insane admit that during his long stay at the Napa asylum he has exhibited no symptom of insanity. He reasons as other men do, he has no delusions, he is more than ordinarily intelligent, his memory is unimpaired, he appreciates exactly the nature of the criminal charge against him, and his relations to the proceeding. As far as mental operations are concerned he is sane as men are ordinarily. According to the testimony of Dr. Smith, under whose care he was at Napa, if he had to judge alone by what he saw of him there he would be obliged to discharge him; and this testimony is strongly corroborated by all the other evidence, both professional and nonprofessional, as to his behavior at the asylum.

But the most conclusive evidence on this point is the testimony of Buchanan himself. He was not sworn as a witness, but he offered himself as an exhibit, and not only by his statement but by his appearance and bearing, both in the superior court and in this court, he showed a perfect possession of his faculties and complete ability to conduct his defense. He gave a connected and rational account of his whole life. He showed

that he understood his position with respect to the criminal charge pending against him, and that so far as his conduct is defensible or mitigable he is master of his defense. He sustained a long and searching cross-examination with perfect self-possession, and was not betrayed into the slightest inconsistency of statement. This being so he claims the right, and the law clearly sustains him in his claim, to a trial upon the criminal charge. If he is innocent he is entitled to have his innocence established. If he is guilty, there is nothing in his present condition to screen him from punishment. If, being found not guilty and discharged from custody, it is thought he should be put under restraint as a person dangerous to be at large, the law affords the means of having that fact adjudicated in a proper proceeding. So far, there never has been a proceeding in which his dangerous lunacy has been, or could be, adjudicated. All that was tried, or could be tried, in the proceeding in the superior court, was the question whether he was then deprived of his reason to such an extent that he could not make his defense to the charge of murder. The finding of the jury and the order of the court there made are conclusive upon that issue, but if the prisoner is to be kept under restraint his whole life long as a dangerous lunatic, some of the methods provided by law for determining that question must first be resorted to.

It is ordered that Hugh Buchanan be returned to the custody of the sheriff of Yuba county, that his trial in the superior court may be proceeded with.

Temple, J., Van Dyke, J., and Henshaw, J., concurred.

McFARLAND, J., dissenting.—I dissent. Leaving out of view, for the present, all questions of law arising in the case, I think that the preponderance of evidence is to the point that the sanity of the petitioner has not been "restored." To say nothing of any consideration to be given to the conclusion of a jury, a superior court, and the superintendent of the asylum, the evidence introduced in the present proceeding, in my opinion, preponderates against his restoration to sanity. The statutory provision in question says nothing about different kinds of insanity; and certainly a man not "sane" should not be put on his trial for murder.

GAROUTTE, J., concurring.—I have no doubt but that under the evidence disclosed by the record in this case the petitioner is insane within the meaning of that word as used in the law applicable to our state hospitals. But conceding that to be his mental condition, it is not necessarily a bar to his prosecution for the commission of a crime. The insanity which demands that a person at large should be confined in an asylum is not the same insanity which bars the prosecution of that person for the commission of a felony. While the petitioner is insane within the law applicable to state hospitals, I think him sane to the extent that he should be tried upon the charge pending against him in Yuba county.

I concur in the order.