[S. F. No. 19603.   In Bank.   Nov. 20, 1956.]

BART LUIS CARITATIVO, Petitioner, v. HARLEY O. TEETS, as Warden of State Prison, etc., Respondent.

George T. Davis for Petitioner.

Edmund G. Brown, Attorney General, and Clarence A. Linn, Assistant Attorney General, for Respondent.

McCOMB, J.—This is a motion to dismiss an appeal from an order denying a petition for a writ of mandate and also for an order directing the issuance of the remittitur forthwith.

CHRONOLOGY

i. Defendant's conviction of two first degree murders was affirmed by this court February 1, 1956. (*People* v. *Caritativo,* 46 Cal.2d 68 [292 P.2d 513].)

ii. Petition for a rehearing was denied February 29, 1956.

iii. Petition for a writ of certiorari was filed with the Supreme Court of the United States and denied June 4, 1956.

iv. On June 18, 1956, the death penalty was imposed on defendant and the date of execution set for August 31, 1956.

v. On April 27, 1956, George T. Davis, attorney for defendant, was informed that the prison psychiatrists were of the opinion defendant was sane.

vi. On May 24, 1955, three psychiatrists on the medical unit of the California State Prison at San Quentin, to wit, David G. Schmidt, M.D., Chief Psychiatrist, M. M. Kirksey, M.D., and M. D. Willcutts, M.D., Chief Medical Officer, advised the warden relative to defendant:

"We are agreed he has some expansive grandiose ideas and feelings of persecution; but no delusions or hallucinations are elicited and he knows the crime of which he was convicted and sentenced to execution and we are agreed he is not insane, albeit he has a Paranoid Personality with some Schizoid and some Neurotic Elements."

vii. On March 30, 1956, Dr. Willcutts, Dr. Schmidt and Dr. Kirksey, all on the prison staff, advised the warden relative to defendant:

"He shows he is oriented well in all spheres, that he has a good memory and still gives some evidence of some expansive grandiose ideas and feelings of persecution. He has a Paranoid Personality with some Schizoid and Neurotic elements; but we are all agreed that he is not insane."

viii. On May 2, 1956, Dr. Willcutts, Dr. Schmidt and A. D. Kopac, M.D., Psychiatrist, all on the prison staff, informed the warden relative to defendant:

"He knows the crime for which he is sentenced, but he does not know, or will not say definitely where his case is in the courts, but feels that Mr. Davis will take good care of his case.

"This subject has a good memory, he is oriented in all spheres, knows right from wrong, is aware of the crime for which he was sentenced and for which he faces execution. He exhibits some grandiose ideas and feelings of persecution, but we are all agreed that he is not insane. He has a paranoid personality with schizoid and neurotic elements."

ix. On August 7, 1956, Dr. Willcutts, Dr. Schmidt and Dr. Kopac advised the warden concerning defendant:

"This subject has a good memory, is oriented in all spheres. He knows right from wrong and is aware of the crime for which he was sentenced and for which he faces execution. He exhibits many grandiose ideas and feelings of persecution; but we are all agreed that he is not legally insane. He has a Paranoid Personality with many Schizoid and Neurotic Elements."

The record fails to disclose any evidence contradicting the findings of the doctors as set forth above.

x. On August 30, 1956, defendant filed a petition for a writ of mandate in the Superior Court of Marin County seeking to compel the warden of San Quentin penitentiary to institute proceedings to determine the present sanity of defendant. The writ was denied by the superior court on the same date and a notice of appeal immediately filed with this court. On August 31, 1956, a stay of execution pending the appeal from the order denying the petition for a writ of mandate was granted.

■ This is the sole question necessary for us to determine: *In view of the provisions of sections 3700 and 3701[1] of the Penal Code, will a writ of mandate issue to compel the warden of the state penitentiary to institute proceedings to determine the present sanity of a prisoner in his custody awaiting execution of the death penalty after the warden has determined that there is not "good reason to believe" such prisoner is presently insane?*

*No.* The method of determining the question of the sanity of a person awaiting execution is controlled by the Legislature.

[1]Section 3700 of the Penal Code reads: "No judge, court, or officer, other than the Governor, can suspend the execution of a judgment of death, except the warden of the State prison to whom he is delivered for execution, as provided in the six succeeding sections, unless an appeal is taken."

Section 3701 of the Penal Code reads: "If, after his delivery to the warden for execution, there is good reason to believe that a defendant, under judgment of death, has become insane, the warden must call such fact to the attention of the district attorney of the county in which the prison is situated, whose duty it is to immediately file in the superior court of such county a petition, stating the conviction and judgment, and the fact that the defendant is believed to be insane, and asking that the question of his sanity be inquired into. Thereupon the court must at once cause to be summoned and impaneled, from the regular jury list of the county, a jury of 12 persons to hear such inquiry."

The Legislature has provided in Penal Code section 3700 that the courts shall not suspend the execution of a judgment of death. It has also provided in section 3701 of the Penal Code for a judicial proceeding to determine the question of defendant's present sanity only when the warden invokes such a proceeding. (*In re Phyle,* 30 Cal.2d 838 at 843 [2] [186 P.2d 134].)

█ It is settled that "due process" does not prevent delegation of the duty of determining the sanity of a person awaiting execution of the death penalty to an administrative official, and judicial review of that officer's determination is not required. (*McCracken* v. *Teets,* 41 Cal.2d 648 at 653 [7] [262 P.2d 561][2]; *Solesbee* v. *Balkcom,* 339 U.S. 9 [70 S.Ct. 457 at 459 [3], 94 L.Ed. 604]; *Nobles* v. *Georgia,* 168 U.S. 398 at 405 et seq. [18 S.Ct. 87, 42 L.Ed. 515].)

Any statements in *Phyle* v. *Duffy,* 34 Cal.2d 144 [208 P.2d 668], which imply a contrary view are overruled.

For the reasons above stated the motion to dismiss the appeal is granted and the stay of execution heretofore granted is terminated. Let the remittitur issue forthwith.

Gibson, C. J., Shenk, J., Traynor, J., and Spence, J., concurred.

SCHAUER, J.—I concur in the judgment and, generally, in the discussion insofar as it relates to petitioner's claimed right to judicial review of the administrative act of the warden. (Mandamus is not a proper vehicle for asserting the right here involved. See concurring and dissenting opinion, *Phyle* v. *Duffy* (1949), 34 Cal.2d 144, 170 [208 P.2d 668].) I do not, however, concur in any possible implication that an insane person may be executed or that the right to the writ of habeas corpus may be suspended or denied absolutely as to persons who are insane or who are under sentence of death, merely because they have been so adjudicated.

---

[2]Justice Schauer, speaking for this court, with whom Chief Justice Gibson and Justices Shenk and Edmonds concurred, said in the cited case at page 653 [7]: "Petitioner asserts that he is denied due process of law if he is not accorded judicial review of the question whether there is good reason to believe that he has become insane. It has been held that federal due process accords him no such right. (Citation.)"

On page 654 of the same case, Justice Traynor, with whom Justice Spence concurred, said: "Procedural due process does not prevent delegation of the duty of determining the sanity of a person under judgment of death to an administrative official and does not require judicial review of that official's determination. (Citations.)"

Penal Code, section 1367, has provided ever since 1872, and still provides, that "A person cannot be tried, adjudged to punishment, or punished for a public offense, while he is insane." Section 26 of the same code declares that "All persons are capable of committing crimes, except those belonging to the following classes: . . .

"Three. Lunatics and insane persons. . . ."

The Constitution of the United States (art. I, § 9, cl. 2) provides that "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." The Constitution of California (art. I, § 5) declares the same fundamental right.

The Penal Code, section 1473, implementing the Constitution, declares that "Every person unlawfully imprisoned or restrained of his liberty, under any pretense whatever, may prosecute a writ of habeas corpus, to inquire into the cause of such imprisonment or restraint." Section 1474 provides that the petition for the writ (which may be signed either by the party for whose relief it is intended or by some person in his behalf) shall specify "If the imprisonment is alleged to be illegal . . . in what the alleged illegality consists." The illegality may consist in the fact that a warden of a prison refuses to obey the law: a prisoner is insane, is known to the warden to be insane, and is nevertheless being held by the warden for the purpose of executing a sentence of death while the prisoner remains insane. In such a case the order granting the writ of habeas corpus would not require the release of the prisoner from all custody (Pen. Code, § 1486) but should release him from the illegal detention; i. e., the detention which, if not limited, will culminate in illegal execution and, if the prisoner belongs in the custody of the superintendent of a hospital for the criminal insane for safekeeping and treatment rather than in the custody of the warden of a state prison for execution, the writ may so order (Pen. Code, §§ 1487, subd. 5, 1493).

Section 3700 of the Penal Code, providing that "No judge, court, or officer, other than the Governor, can suspend the execution of a judgment of death, except the warden of the State prison to whom he is delivered for execution, as provided in the six succeeding sections, unless an appeal is taken," by its own provision has no application to the powers of the court or a judge when an appeal has been taken and manifestly it cannot, by express prohibition of the Constitutions of both

the United States and the State of California, operate to suspend the constitutionally granted rights of the citizens to sue out, and the courts and judges to grant, writs of habeas corpus, with such stays of execution as may be appropriate. Manifestly, the power to issue a writ of habeas corpus in a death penalty case includes the power to stay execution. The very issuance of the writ must as a necessary incident effect a stay until after the writ has been discharged or an appropriate order made, else the writ could not be obeyed. Sections 3701 et seq. must, therefore, be construed, as their own language comprehends, as *definitive of the duties* of a warden of a prison when "there is good reason to believe that a defendant, under judgment of death, has become insane," or "that a female . . . [under like commitment] is pregnant." (Certain duties are also imposed upon the district attorney by the mentioned sections in the contemplated circumstances.) *But such sections do not purport to cover the situation where the warden fails to obey the law.*

Certainly no provision in chapter 2 (of tit. 3, pt. 3) of the Penal Code (the chapter containing sections 3700 to 3706, inclusive) purports to declare that the warden of a prison is above the law and his acts beyond cognizance of the courts. Neither does any provision of law purport to authorize the execution of an insane person or a pregnant woman, or to suspend, in contravention of the Constitutions of the United States and of the State of California, the issuance of writs of habeas corpus or the inherent power of the court, or a justice thereof, in such cases to stay execution.

The constitutional provisions safeguarding the writ of *habeas corpus ad subjiciendum* are wise. The right to that writ was hard won by our ancestors. It gained formal recognition as the vehicle for inquiring into the lawfulness of the restraint of a person detained in another's custody upon passage of the Petition of Right (16 Chas. I, ch. 10, § 8) and the subsequent passage in 1679 of the Habeas Corpus Act (31 Chas. II, ch. 2). It should not be stricken down in whole or whittled away in part by any decision of this court. To hold it inapplicable in the case of prisoners under sentence of death who are insane, or who are pregnant, would mean that, conceivably, a warden, knowing full well that a prisoner was a lunatic, completely bereft of reason, unknowing the act for which he was sentenced or even that he was to be punished, could proceed with the execution. Likewise, such a warden, knowing that a female under death sentence was

about to be delivered of child, could proceed with the execution of the convicted prisoner and, as an incident thereof, of the unborn infant. And, the writ of habeas corpus being suspended in such cases, no court or judge could stay the execution. (See majority holding in *In re Phyle* (1947), 30 Cal.2d 838, 850 [186 P.2d 134]; see also dissenting opinion, *id.*, 851 et seq.; see concurring and dissenting opinion, *Phyle* v. *Duffy* (1949), *supra,* 34 Cal.2d 144, 163 et seq.; *Phyle* v. *Duffy* (1948), 334 U.S. 431 [68 S.Ct. 1131, 92 L.Ed. 1494], concurring opinion of Mr. Justice Frankfurter, pp. 444-445 of 334 U.S.)

The concept of using mandamus (a superior court civil proceeding carrying with it a right to appeal and ensuing delay) as a substitute for habeas corpus was an unfortunate expedient which had better never have been innovated. (See *In re Phyle* (1947), *supra*; *Phyle* v. *Duffy* (1948), *supra,* 334 U.S. 431; *Phyle* v. *Duffy* (1949), *supra,* 34 Cal.2d 144, 147, 167, 171.) I am glad to concur in holding that such remedy is inapplicable.

There should be few, if any, unjustified delays attendant upon use of the conventional vehicle, habeas corpus, upon proper showings. This court will not issue such writ upon tardy application or the mere averment of conclusions, or of the ultimate fact, or of general statements of facts. The principles enunciated in *In re Swain* (1949), 34 Cal.2d 300, 304 [209 P.2d 793], should be strictly applied in all related situations. (See also *People* v. *Shorts* (1948), 32 Cal.2d 502, 506 [197 P.2d 330].)

For the reasons, and with the limitations, above stated, I concur in the orders dismissing the appeal, terminating the stay of execution and issuing the remittitur forthwith.

CARTER, J., Concurring and Dissenting.—Because it is and always has been my view that mandamus is not available to determine the sanity of a person under sentence of death and that habeas corpus is the only remedy available to such a person, I concur in the order for the dismissal of the appeal. I dissent from the holding in the majority opinion that there can be no judicial review of the determination of the warden as to the sanity of a person under sentence of death as it is my opinion that habeas corpus is available to review such a determination. (See concurring and dissenting opinion of Mr. Justice Schauer in *Phyle* v. *Duffy*, 34 Cal.2d 144 [208 P.2d 668], and my dissent in *McCracken* v. *Teets,*

41 Cal.2d 648, 654 [262 P.2d 561].)  I agree with the views expressed by Mr. Justice Schauer in his concurring opinion in the case at bar with respect to the availability of the writ of habeas corpus in a case such as this, and on the record before us, such remedy should be available to the petitioner here.